EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

SHEET METAL WORKERS, INTERNATIONAL ASSOCIATION, LOCAL NO. 122, Defendant.

Civ. A. No. M–74–3.

United States District Court, D. Maryland.

Nov. 24, 1978.

Hal Ponder, Edward J. Dempsey, and Peter M. Connolly, Washington, D.C., for plaintiff EEOC.

Pamela M. Isackes, New York City, and Allen A. Davis, Jr., Richard L. North, Mary Ellen Rinehardt, Lawrence B. Coshnear, and Diana Greene, Baltimore, Md., Robert J. Lenrow, Washington, D.C., for private plaintiffs.[1]

John J. Hirsch, Wilson K. Barnes, and Paul E. Gaeng, Baltimore, Md., for defendant Local 122.

Alan I. Baron, and Jeffrey E. Rockman, Baltimore, Md., for JATC.[2]

## OPINION

JAMES R. MILLER, Jr., District Judge.

### Introduction

This memorandum constitutes the court's findings of fact and conclusions of law after trial of this action challenging the practices of defendant Local 122, Sheet Metal Workers International Association (Local 122), which practices first the United States At-

---

1. The trial was held on the present case and a consolidated case, Civil Action No. 72–848–M (Case F), in which private plaintiffs sued the defendant Local 122 and the Joint Apprenticeship Training Committee of Local 122 under 42 U.S.C. § 1981 and other federal statutes. The Joint Apprenticeship Training Committee was granted a verdict by the court at the conclusion of plaintiffs' case and the remainder of the private plaintiffs' case was dismissed by the court at the conclusion of all the evidence. This opinion, therefore, deals only with the remaining unresolved portion of the consolidated case.

2. See footnote 1.

torney General[3] and then the Equal Employment Opportunity Commission (EEOC) have alleged a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (hereinafter sometimes referred to as "Title VII").

In the Amended Complaint (Paper 42) and the Pretrial Order (Paper 250; Paper 597),[4] the plaintiff alleges that Local 122 has engaged in a pattern and practice of discrimination against black workers in violation of Title VII.

The plaintiff's burden in a pattern and practice case has been explained in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), where the Court said:

> "As the plaintiff, the Government bore the initial burden of making out a prima facie case of discrimination . . . And, because it alleged a systemwide pattern or practice of resistance to the full enjoyment of Title VII rights, the Government ultimately had to prove more than the mere occurrence of isolated or "accidental" or sporadic discriminatory acts. It had to establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice."

*Id.* at 336, 97 S.Ct. at 1855. (citations and footnote omitted).

The Court elaborated, writing:

> "The 'pattern or practice' language in § 707(a) of Title VII . . . was not intended as a term of art, and the words reflect only their usual meaning. Senator Humphrey explained:
>
> "[A] pattern or practice would be present only where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature.

> There would be a pattern or practice if, for example, a number of companies or persons in the same industry or line of business discriminated, if a chain of motels or restaurants practiced racial discrimination throughout all or a significant part of its system, or if a company repeatedly and regularly engaged in acts prohibited by the statute.
>
> "The point is that single, insignificant, isolated acts of discrimination by a single business would not justify a finding of a pattern or practice . . . .' 110 Cong. Rec. 14270 (1964)."

*Id.* at 336, n. 16, 97 S.Ct. at 1855.

In this case the Government has asserted Local 122's liability on the theory that Local 122 treats blacks differently than it treats whites. Under this theory, the ultimate factual question is "whether there was a pattern and practice of such disparate treatment and, if so, whether the differences were 'racially premised.' " *Id.* at 335, 97 S.Ct. at 1854. "Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Id.*, n. 15.

Also in this case the Government has asserted Local 122's liability on the disparate impact theory that Local 122 uses "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* at 336, n. 15, 97 S.Ct. at 1854. Proof of discriminatory motive is not required under the disparate impact theory. *Id.* In *Dothard v. Rawlinson*, 333 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), the Court described the respective burdens of the plaintiff and defendant in a Title VII disparate impact case:

---

**3.** This suit, Civil No. M–74–3 Case B, was commenced by the Attorney General's allegation of a pattern and practice in violation of 42 U.S.C. § 2000e–6(a). Pursuant to the Equal Employment Opportunity Act of 1972, the suit was continued by the EEOC, 42 U.S.C. § 2000e–6(c) and (d).

**4.** If two pleading docket numbers are listed, the higher number is the number of the same pleading in *Campbell v. Local 122*, Civil No. 72–848–M Case F, a related § 1981 case consolidated for trial. Commonly, a pleading was docketed in each case.

"Those cases make clear that to establish a prima facie case of discrimination, a plaintiff need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern. Once it is thus shown that the employment standards are discriminatory in effect, the employer must meet 'the burden of showing that any given requirement [has] . . . a manifest relationship to the employment in question.' *Griggs v. Duke Power Co.,* *supra,* 401 U.S. at 432, 91 S.Ct. at 854. If the employer proves that the challenged requirements are job related, the plaintiff may then show that other selection devices without a similar discriminatory effect would also "serve the employer's legitimate interest in "efficient and trustworthy workmanship.' "

*Id.* at 329, 97 S.Ct. at 2726. (citations omitted). *See, e. g., Roman v. E.S.B.,* 550 F.2d 1343, 1350 (4th Cir. 1976).

Governed by these principles, this court will now examine the facts in this case.

## FINDINGS OF FACT AND LEGAL STANDARDS

### I

### LOCAL 122—GENERAL

Local 122 is a labor organization, as that term is defined in Section 701(d) of Title VII, as amended, 42 U.S.C. § 2000e(d). It represents workers in the sheet metal industry (Stipulation[5] 187 [hereinafter "St."]). The geographical jurisdiction of Local 122 includes the Maryland counties of Anne Arundel, Baltimore, Calvert, Caroline, Carroll, Cecil, Dorchester, Harford, Howard, Kent, Queen Anne's, Somerset, Talbot, Wicomico, and Worcester as well as Baltimore City (St. 189). Local 122, through its Labor Committee, represents its members in collective bargaining negotiations with the Sheet Metal and Roofing Contractors Association of Baltimore, Maryland and with individual sheet metal contractors who are not members of that Association (St. 192).

Local 122 is required to file annual EEO–3 reports with the Equal Employment Opportunity Commission. The EEO–3 reports submitted by Local 122 in 1968 and 1969 (Plaintiffs' Exhibits 85 and 86 [hereinafter "PX"]) reflect that, in response to the EEOC's inquiry whether Local 122 had modified its collective bargaining agreement after the effective date of Title VII (July 2, 1965) in order that it would contain a specific clause prohibiting discrimination, Local 122 responded that it had not done so.

Members of Local 122 receive the following fringe benefits: health and welfare benefits, pension benefits, and a skill improvement program (St. 194).

At the time suit was brought the wage scale for a union sheet metal journeyman was substantially higher than the wage scale paid a non-union sheet metal journeyman (Vol. 15 Transcript, P. 48 [hereinafter Tr.]; St. 193).

At the end of the trial, the plaintiff EEOC dismissed with prejudice its allegations regarding the size of Local 122 and the selection devices used by Local 122 (15 Tr. 59–60). The allegations dismissed were:

"1. The claim that Local 122 has perpetuated past discrimination by artificially limiting the size of the local union. (No. 28, p. 7, Plaintiffs' Revised Pre-Trial Order).

"2. The claim that Defendant Local 122's selection devices and requirements, i. e., the journeyman tests, work and age requirement, residency requirement, and employer recommendations, [for handyman membership], discriminate against blacks. (No. 30(a)–(f), pp. 7–9, Plaintiffs' Revised Pre-Trial Order)."

Paper 259; *see* Pretrial Order Paper 250.

### II

### LOCAL 122 MEMBERSHIP

There are four kinds of membership in Local 122: journeyman, handyman (sometimes called production worker), limited

---

5. Numbered stipulations are contained in PX 153.

(retired), and fourth-year apprentice member. Journeyman and handyman members (sometimes collectively called active members) have full privileges and voting powers. This case in its present posture does not directly relate to retired or apprentice members (*See* St. 202–206).

The designations "journeyman" and "handyman" reflect different kinds of skill in the sheet metal trade and different employment situations. The racial composition of Local 122's combined membership in the journeyman and handyman categories is reflected in this table:

LOCAL 122 MEMBERSHIP
1960 to 1977, BY RACE

| NUMBERS OF MEMBERS AS OF: JANUARY 1 | TOTAL | BLACK | WHITE |
|---|---|---|---|
| 1960 | 500 | 0 | 500 |
| 1965 | 546 | 0 | 546 |
| 1966 | 548 | 0 | 548 |
| 1967 | 551 | 0 | 551 |
| 1968 | 569 | 0 | 569 |
| 1969 | 580 | 0 | 580 |
| 1970 | 582 | 0 | 582 |
| 1971 | 584 | 0 | 584 |
| 1972 | 614 | 0 | 614 |
| 1973 | 618 | 0 | 618 |
| 1974 | 598 | 0 | 598 |
| 1975 | 605 | 3 | 602 |
| 1976 | 585 | 5 | 581 |
| 1977 | 548 | 4 | 544 |

(St. 213; St. Table VII).

Applicants for direct admission to Local 122 as handymen are not required to take an examination, nor must they fulfill a four-year work requirement or age requirement, but they must be an employee of a union contractor in a specialty skills trade, e. g., the manufacture of kitchen equipment (*See* St. 218, 200). An individual applying for handyman membership must be recommended for membership by the contractor employing him (St. 219). In order subsequently to become a journeyman, a handyman must pass a journeyman test (St. 220). A handyman who wishes to apply for journeyman membership in Local 122 must be recommended by his employer for such status (St. 221). A handyman is sometimes called a "production worker".

The procedures, criteria, and tests for admission as a journeyman are described in Stipulations 222–247, but as previously noted, the plaintiff has dismissed with prejudice its challenge to them except with respect to the general custom that persons seeking direct admission as journeyman members of Local 122 have been required to first obtain work with a union sheet metal contractor and maintain such employment for a period of time prior to applying for membership.

Prior to 1974 and dating back to 1950, Local 122 never had a black journeyman or handyman member (St. 215). In 1974, three blacks became journeymen upon graduation from the JATC apprentice program (St. 216). There were approximately four black production workers or handyman members in Local 122 in 1977 (14 Tr. 63–64). There was one black journeyman member of Local 122 in 1977, Melvin Robinson (8 Tr. 75–76). The two other black journeyman admitted with Mr. Robinson in 1974 withdrew from Local 122, reportedly for lack of work (8 Tr. 100–101).

The evidence does not break down the white active membership of Local 122 as between journeymen and handymen. All of the officers, business managers, and business representatives of Local 122 from its inception to the date of trial in October, 1977, have been white (St. 199).

III

LOCAL 122's WORK

The main types of work performed by members of Local 122 are sheet metal roofing; the erection, welding, layout, testing and balancing of sheet metal ductwork and other types of sheet metal installations; the use of sheet metal in kitchen equipment; and general sheet metal shop work (St. 200). The work performed by Local 122 members is exclusively in the building construction industry and primarily in the commercial and industrial, rather than the residential, segments of the industry (10B Tr. 64, 90; 12B Tr. 163, 166; "Agreement Between Sheet Metal & Roofing Contractors

Ass'n of Baltimore, Maryland and Sheet Metal Workers' International Ass'n of Baltimore, Maryland, Local Union No. 122," Art. I, at 1–4 (1970), PX 79).

Welding is an increasingly important "tool of the trade" of a journeyman sheet metal worker. It is only one skill among many, however, that a person must possess in order to qualify as a journeyman sheet metal worker (*See,* e. g., St. 201; 7 Tr. 34–35; 8 Tr. 31–32, 47; 10B Tr. 91; 12A Tr. 16–18).

After an individual's admission as a journeyman member of Local 122, he is eligible for work in all facets of the sheet metal trade as far as Local 122 is concerned (St. 248).

Although sheet metal work in the ship building industry is one type of sheet metal work recognized in the trade by the Sheet Metal Workers' International Association (*see Constitution and Ritual* Art. I, § 5, at 1–9 (1974), PX 78), the jurisdiction of a local union does not invariably encompass all types of work claimed by the International Association (*see id.* Art. III, § 2(g), at 27–28). There is no evidence in this case suggesting that Local 122 has jurisdiction over the sheet metal work done in the Bethlehem Steel Company's shipyard.

### A. *LEGAL STANDARDS FOR STATISTICAL PROOF*

Since the passage of Title VII, courts have frequently relied, in part, on statistical evidence to find a prima facie case of unlawful discrimination. *E. g., International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 340 n. 20, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *EEOC v. Chesapeake & Ohio Ry.,* 577 F.2d 229 (4th Cir. 1978); *Lewis v. Tobacco Workers' International Union,* 577 F.2d 1135 (4th Cir. 1978); *Roman v. ESB, Inc.,* 550 F.2d 1343 (4th Cir. 1976) (*en banc*); *Patterson v. American Tobacco Co.,* 535 F.2d 257 (4th Cir. 1976); *Barnett v. W. T. Grant Co.,* 518 F.2d 543 (4th Cir. 1975); *Brown v. Gaston County Dyeing and Machine Co.,* 457 F.2d 1377 (4th Cir. 1972).

The *Teamsters* Court has observed:

"[A]bsent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired. Evidence of longlasting and gross disparity between the composition of a work force and that of the general population thus *may be significant* even though § 703(j) makes clear that Title VII imposes no requirement that a work force mirror the general population."

431 U.S. at 340 n. 20, 97 S.Ct. at 1856 (emphasis added). The Supreme Court has instructed trial courts in Title VII cases that when the evidence is a comparison of a defendant's actual work force to the general population or to a specially qualified work force,[6] the probative value of the comparison depends on the extent of the special qualifications and abilities of the defendant's actual work force in relation to the comparison work force. *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *International Brotherhood of Teamsters v. United States, supra; Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974).

In *Hazelwood,* the Government compared the racial composition of the defendant's actual teacher work force to the racial composition of the qualified public school teacher population in the relevant geographic area, and the Supreme Court approved this comparison, noting:

"In *Teamsters,* the comparison between the percentage of Negroes on the employer's work force and the percentage in the general areawide population was highly probative, because the job skill there involved—the ability to drive a truck—is one that many persons possess or can fairly readily acquire. When special qualifications are required to fill particu-

---

**6.** The term used here is "work force"; other decisions use the terms "labor pool" or "labor market". No discernible different exists between the terms.

lar jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value. The comparative statistics introduced by the Government in the District Court, however, were properly limited to public school teachers, and therefore this is not a case like *Mayor v. Educational Equality League*, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630, in which the racial-composition comparisons failed to take into account special qualifications for the position in question. *Id.* at 620–621, 94 S.Ct., at 1333–1334."

433 U.S. at 308 n. 13, 97 S.Ct. at 2742. Thus *Hazelwood* teaches that when comparing the defendant's work force with the general population, the court must take into account special qualifications for the positions in question.

The error in failing to account for the special qualifications was illustrated in *Educational Equality League*. There, in reversing the District Court, the Court of Appeals had found that the small proportion (15%) of blacks on the 1971 Panel for nominating persons to serve as Philadelphia School Board members compared to the general population (34%) of blacks was "'significant'" in establishing discrimination. 415 U.S. at 619–620, 94 S.Ct. 1323. Sustaining the district court's rejection of the comparison to general population statistics, the Supreme Court reasoned:

"[T]he simplistic percentage comparisons undertaken by the Court of Appeals lack real meaning in the context of this case. Respondents do not challenge the qualifications for service on the Panel set out in the charter, whereby nine of the 13 seats are restricted to the highest-ranking officers of designated categories of citywide organizations and institutions. Accordingly, this is not a case in which it can be assumed that all citizens are fungible for purposes of determining whether members of a particular class have been unlawfully excluded. At least with regard to nine seats on the Panel and assuming, *arguendo*, that percentage comparisons are meaningful in a case involving discretionary appointments, the relevant universe for comparison purposes consists of the highest ranking officers of the categories of organizations and institutions specified in the city charter, not the population at large. The Court of Appeals overlooked this distinction. Furthermore, the District Court's concern for the smallness of the sample presented by the 13-member Panel was also well founded. The Court of Appeals erred in failing to recognize the importance of this flaw in straight percentage comparisons.

"In sum, the Court of Appeals' finding of racial discrimination rests on [*inter alia*] . . . racial-composition percentage comparisons that we think were correctly rejected by the District Court as meaningless. In our view, this type of proof is too fragmentary and speculative to support a serious charge in a judicial proceeding."

*Id.* at 620–621, 94 S.Ct. at 1333.

 Two lessons are taught the lower federal courts by these Supreme Court decisions. First, to be meaningful—here to be probative of unlawful discrimination—the statistical comparison of defendant's work force can be made only to a work force with similar qualifications. It may be in a given case that the general population is qualified already for the work in question or at least is as qualified as those actually hired or utilized by the defendant (*See, e. g., Teamsters, supra,* where the Court believed that the ability to drive a truck was one that many persons in the general population possess or can readily acquire, 433 U.S. at 308 n. 13, 97 S.Ct. 2736). "Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications." *Griggs v. Duke Power Co.,* 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). *Accord, McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800–802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (individual plaintiff must prove himself qualified); *East Texas Motor Freight v. Rodriguez,* 431 U.S. 395, 403–404, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) (same). Therefore, if the general

population lacks the special training, skills, or other qualifications needed for a job, then the comparison of the defendant's work force to the general population is "meaningless," and the comparison must be made to a qualified work force. *E. g., Educational Equality League, supra.*

As the Fourth Circuit elaborated in *EEOC v. Chesapeake & Ohio Ry., supra*:

"In the absence of data concerning the number of qualified black persons in the labor pool, the commission's evidence is insufficient to establish a prima facie case of racial discrimination against black employees as a class. *See Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Teamsters v. United States*, 431 U.S. 324, 334–43, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)."

577 F.2d at 233. Moreover, in *EEOC v. United Virginia Bank*, 555 F.2d 403 (4th Cir. 1977), the court instructed:

"Where the work requires special qualifications, it is proper to consider the ratio of qualified blacks and whites in the appropriate work force rather than the ratio of the gross percentage of blacks and women in the whole work force, including unskilled labor. After all, in any discrimination case, 'one element which remains essential is that the minority applicant be qualified for the position for which he applies.'"

Id. at 406 n. 7 (citations omitted).

■ If a work force comparison is relied upon by a plaintiff in a Title VII case, it must be shown as part of the prima facie statistical case that the work force to which the defendant's actual work force is compared is qualified in fact to do the job.

Plaintiff asserts that it need not show that the comparison work force is similarly qualified, and it cites *Griggs v. Duke Power Co., supra; Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Teamsters, supra*; and *Barnett v. W. T. Grant Co., supra*. In those cases the plaintiff established a prima facie case by showing that a specific employment practice, *e. g.*, the test in *Griggs*, had a disparate impact on blacks; no showing by the plaintiff of a similarly qualified work force was required. *See Dothard, supra.*

■ The plaintiff's argument, however, neglects a crucial distinction. Statistics disclosing an employment practice's disparate impact on blacks are direct evidence of a Title VII violation, *i. e.*, use of a facially neutral practice which has a disparate impact but which is not required by business necessity. Such evidence focuses only on applicants who are actually exposed to the defendant's practices and *a fortiori* who have been determined by the defendant to be as qualified as the other applicants reaching that phase of the selection process.

■ In contrast, statistics disclosing a racial imbalance in a defendant's work force compared to the general population are not direct evidence of a Title VII violation since the employment of a racially imbalanced work force is not unlawful. 42 U.S.C. § 2000e–2(j); *Teamsters*, 431 U.S. at 340 n. 20, 97 S.Ct. 1843; *Lewis v. Tobacco Workers International Union*, 577 F.2d at 1141. If, however, a significant racial imbalance is disclosed between a defendant's work force and the available similarly qualified work force, then the trier of fact must weigh the fact of the statistical imbalance with all the other relevant facts in determining whether the plaintiff has proven by a preponderance of the evidence its prima facie case, and thereby required the defendant to explain its practices. *See, e. g., Educational Equality League, supra; Hazelwood, supra; EEOC v. Chesapeake & Ohio Ry., supra; Lewis v. Tobacco Worker's International Union, supra; Roman*, 550 F.2d at 1350–1351.

A second lesson drawn from the Supreme Court decisions referred to earlier, particularly pertinent as will be seen in this case, is that consideration of a small size sample may sharply reduce the probative value of statistical evidence. *Teamsters*, 431 U.S. at 340 n. 20, 97 S.Ct. 1843; *Educational Equality League*, 415 U.S. at 620–621, 94 S.Ct. 1323. *See also, EEOC v. Chesapeake & Ohio Ry.*, 577 F.2d at 232–33.

Governed by these principles, this court turns to the statistics produced in this case.

### B. BUILDING TRADE SHEET METAL WORKERS

The core of the comparison work force relevant to this case consists of journeyman level sheet metal workers in the nonunion sector of the building trade in the Baltimore area. Whoever else or whatever other groups *may* be included in the comparison work force relevant for determination of Local 122's liability, there is no dispute that this core group *must* be included.

### (1) The Numbers

At the time of trial in this case, probably 22 or 23 black persons had worked at one time or another in the recent past in the nonunion sector of the sheet metal trade of the building construction industry in the Baltimore SMSA,[7] many of whom might be qualified as journeyman but some of whom were shown at trial to be unqualified (*See* 2 Tr. 78–79 (Mr. Winke himself); 2 Tr. 109 (Mr. Williams himself); 7 Tr. 45 (Mr. Campbell himself, but not qualified); 8 Tr. 52 (Mr. D. Anderson himself, but not qualified); 14 Tr. 149–150 (Mr. Collins' friend who is now in school); 15 Tr. 34, 43 (Mr. Jackson himself, 10 other employees of Ingleside Mechanical Contractors, 3–4 others); 14 Tr. 52–53 (Local 122's recruitment of Mr. Witherspoon, now perhaps deceased, 14 Tr. 2–5); 11 Tr. 85 (2 or 3 black persons seen welding in a nonunion sheet metal shop); 15 Tr. 96–101 (colloquy with counsel).

The plaintiff suggests that there must be more black journeymen nonunion sheet metal workers who could be expected to apply to Local 122 for membership. Such a finding would be speculation sharply in conflict with the limited evidence presented by plaintiff; with the serious difficulty plaintiff had in finding black journeymen witnesses;[8] and finally with the consistent testimony that few, if any, black journey-

men were or are known to various union members, contractors, and one former government official (*See* 10B Tr. 83, 119–120 (Mr. Russell, Local 122 business manager or officer for 22 years, never observed black journeymen sheet metal worker locally on union or nonunion jobs, except for some from New York for temporary work); 11 Tr. 71–85 (Mr. Wenderoth, a Local 122 member for 30 years and a teacher in a Baltimore City apprentice program for one year who visited eight or nine nonunion shops to place the City apprentices, observed two or three black persons welding in a sheet metal shop but did not know of any black journeymen); 12A Tr. 2 (Mr. Courtney, a former organizer for the steamfitters union—a related mechanical construction trade which works on the same jobs, but not in the same shops as the sheet metal trade, *id.* 39–40, observed no nonunion black sheet metal journeymen on the job sites during his 1964–1969 recruiting efforts, *id.* 6, but had no knowledge of nonunion shops, *id.* 40); 13 Tr. 14, 26–28 (Mr. M. Anderson's 1974 efforts as a union contractor's superintendent and sheet metal journeyman to find and hire black sheet metal journeymen for a Naval Academy building); 14 Tr. 5 (Mr. Ulrich's 1969 efforts as a union contractor's manager to find and hire black sheet metal journeyman, *id.* 7–10; his February 6, 1969 (presuit) letter as president of union contractors association to H.U.D. Office of Equal Employment Opportunity asserting willingness to hire but inability to find black sheet metal journeyman, *id.* 12–13, 18–22, DX 95; and finally his present observation as a nonunion contractor that he doesn't know and hasn't heard of any black journeymen, *id.* 14, 32–34); 14 Tr. 38–40 (Mr. Fortier's 1971 efforts as union contractor's project manager to find and hire black journeyman for Social Security building); 14 Tr. 73–75 (Mr. Wilford, the Local 122 business mana-

---

7. Standard Metropolitan Statistical Area.

8. Mr. Jackson, a rebuttal witness on the final day of trial, a Monday, whose testimony establishes 13 of the 22 or 23 persons in the work force, was not contacted by plaintiff until the day, a Sunday, before the last day of testimony, 15 Tr. 43, as a result of Friday testimony in defendant's case, 15 Tr. 31–32.

ger's 1975–77 organizing efforts found non-union black journeymen only at Ingleside (Mr. Jackson et al.) and at Allstate (Mr. D. Anderson); 14 Tr. 141, 148–152 (Mr. Collins, a fourth year black J.A.T.C. apprentice didn't know anyone interested in joining Local 122 who wasn't in J.A.T.C. program); and finally the testimony of Mr. Muntain).

Mr. Muntain has been a member of the Construction Engineers Workers Union, the president of the Baltimore Building Trade Council during 1961–64, the chief labor liaison for the E.E.O.C. for sometime between 1964 and 1969, and the Director, H.U.D. Office of Equal Employment Opportunity during 1969, and he is now employed as a foreman for a construction company. For some time he has been an attorney and a member of the Maryland Bar (13 Tr. 2–6). Mr. Muntain testified that during 1961–64, he was generally familiar with the sheet metal workers in the Baltimore area and he knew of no black sheet metal workers in the area at that time. (14 Tr. 101–103).

Even after allowing for the often limited basis of knowledge underlying the testimony of these witnesses and the bias of many of them toward the union, this court finds that their testimony is generally credible relating to the scarcity of black journeyman nonunion sheet metal workers in the area. This testimony negates any speculative inference that there must be more black journeymen nonunion sheet metal workers somewhere out there.

The total number of journeyman level sheet metal workers in the nonunion sector of the building industry has not been established by the evidence. Nor has the total number of all journeyman—union and non-union—in the sheet metal segment of the building trade been established. One reason those totals have not been established is that, as explained below, the U.S. Census Bureau statistics for sheet metal workers and tinsmiths classified by occupation only are not a reliable basis for determining the total numbers of either white or black journeyman level sheet metal workers in the building construction industry. A second reason is that the only testimony about the total number of sheet metal workers was that of thirty-five year Local 122 journeyman Mr. Osmond P. Wenders, who in explanation of his not knowing Melvin Robinson, a black journeyman, said, "I can't say that I do . . . There is possibly a thousand sheet metal workers in the city." (11 Tr. 75). This number was not solicited, given, or understood as an estimate of the number of journeyman sheet metal workers in the geographic area over which Local 122 has jurisdiction. The plaintiff has not established by a preponderance of the evidence the total number of journeyman sheet metal workers in the building industry in the geographic area over which Local 122 has jurisdiction.

After eliminating the two persons shown not to be qualified to be journeyman sheet metal workers, the court finds by a preponderance of the evidence that there are approximately 21 nonunion black sheet metal workers in the jurisdiction of Local 122, many of whom would be qualified journeyman and that there is no persuasive direct evidence of the total number of black and white, or just white, nonunion journeyman sheet metal workers in Local 122's jurisdiction.

### (2) Comparison And Findings

█ In the absence of data revealing the proportion of blacks (21) in the total (unknown) work force of nonunion sheet metal journeymen in the building trade, the plaintiff's evidence is insufficient to establish a prima facie case in this manner. *See EEOC v. Chesapeake & Ohio Ry., supra.*

### C. SHIPYARD SHEET METAL WORKERS

The inclusion of sheet metal workers from Baltimore area shipyards in the comparison work force must be examined on two grounds—number and qualification.

### (1) The Numbers

Mr. Evans, a black first class sheet metal worker employed by Bethlehem Steel Corporation (15 Tr. 14–15), apparently at its Sparrows Point Shipyard (*id.* 19), testified

that about 15 or 20 black first class sheet metal workers have worked at Bethlehem Steel since 1968 (*id.* 18). Mr. D. Anderson, a black person, was employed at the Bethlehem Steel Sparrows Point Shipyard as a first class sheet metal worker (8 Tr. 52–54). Mr. Robinson, a black member of Local 122 and a graduate of the 4 year J.A.T.C. program is employed at Bethlehem Steel Corporation's Key Highway Shipyard (8 Tr. 75–76). There is no evidence whether there are any additional black sheet metal workers at the Bethlehem Steel Key Highway Shipyard or at Maryland Shipbuilding and Drydock. The total number of black sheet metal workers from the shipyards who are not already members of Local 122 then is 15 or 20.

There is no evidence on the number of white sheet metal workers in the shipyards.

*(2) Qualifications*

The general testimony is consistent that the sheet metal workers at the shipyards do work which is similar to the work done by Local 122's members (8 Tr. 103 (Mr. Robinson, black Local 122 member); 15 Tr. 18 (Mr. Evans); 8 Tr. 58 (Mr. D. Anderson); 10B Tr. 80–81 (Mr. Donnelly, recording secretary and 25 year member of Local 122); 10B Tr. 99, 12B Tr. 66–67 (Mr. Russell, Local 122 business manager and 37 year member); 8 Tr. 40–41 (Petty Officer Copeland, plaintiff's expert witness)). This general testimony, however, is subject to a crucial qualification made by both Mr. Russell and Petty Officer Copeland.

Mr. Russell, Local 122's business manager, testified under cross-examination by plaintiff:

"Q. Did you ever, during this period of time or later, seek to obtain qualified sheet metal workers from a shipyard?

"A. No, we didn't because we have used their men at times. When they were slow we have used their men to fill in when we were busy; but to obtain them, you know, when you get to the shipyard it's different from the building trades. In my experience, and, of course, now it may have changed some, in the shipyard, if you're a cutter, as we call cutters, they have what they call lofts men who take and trace on a piece of paper a fitting, and he takes that down in the shop and gives it to a man who traces it on metal and cuts it out. We don't call that a cutter. In the shipyard, Sparrows Point, they have specialty people who do one thing. Now, in the time I am speaking of, they were not qualified to do our work. They could work on a piece of machinery or something like that, but to give them a drawing, they were not at that time that qualified.

"Q. Weren't they doing ventilation on boats at that time?

"A. Yes, but ventilation on boats, let me tell you, is different than in a building. As I told you, the guy who cuts that, lays that fitting out and cuts that fitting out, not one guy does that. They have a guy who measures and a guy who lays it out, what they call a lofts man. Then they take it to a sheet metal shop after it's been already laid out and give it to a man.

"Q. Isn't ventilation duct work done on boats similar?

"A. Yes. Air conditioning is done on boats.

"Q. Isn't that similar to the type of work performed by Local 122 members?

"A. It is similar. You would say it is similar, but there is a difference in it too.

"Q. Isn't it true, as you have just testified, that there were occasions, in fact, when you used people from the shipyard?

"A. Yes, to work with our people.

"Q. And they did the same kinds of things that Local 122 members did?

"A. With one of our guys, yes."

(12B Tr. 166–168).

Petty Officer Copeland, plaintiff's own expert witness testified:

"Q. In your opinion, can a journeyman sheet metal worker employed in a shipyard readily transfer his skills to the type of work involved in large building construction?

"MR. HIRSCH: Objection.

"THE COURT: Do you mean the next day or ten years later?

"MR. DAVIS: Yes, sir I mean do it the next day.

"THE COURT: I'll overrule the objection with that modification.

"THE WITNESS: Certain phases, yes; certain phases, no.

"BY MR. DAVIS:

"Q. What phases would he not be able to?

"A. Layout work would be the same. Some installation would be different. There may be a different type of hanger. It would be a basic thing like that. Not the general scope of the work.

"Q. Would the type of things that are different be the type of things which would be, in your opinion, difficult to learn?

"A. No.

"THE COURT: Difficult to learn in what period of time? Are we talking about the next day or something that you would have to take a course to do?

"MR. DAVIS: That was going to be the next question.

"THE WITNESS: You probably couldn't do it the next day but you wouldn't have to take a special course. You would probably have to see the job specification, see what kind of seam it requires and what kind of hanger is required. It would be difficult.

"BY MR. DAVIS:

"Q. How long? Are you talking about years?

"A. No. Months. Maybe one month."

(8 Tr. 40–41).

■ While the "general scope" of sheet metal work in the shipyard and the building construction industry are similar and some "phases" are the same, a sheet metal worker at the journeyman level for shipyard work would need "maybe one month" or maybe more "months" of on-the-job training to adjust his skills and techniques for construction trade work at the journeyman level (*See* 7 Tr. 28–30 (Chief Petty Officer Halfkenny, plaintiff's welding expert, testified that three weeks of regular eight hour days were needed for a heavy metal welder to qualify as sheet metal welder)). Because they are not presently able to do building construction industry sheet metal work at the journeyman level, the shipyard sheet metal workers may not be included in the comparison work force relevant to Local 122's liability under Title VII for race discrimination.

The plaintiff argues that while a shipyard sheet metal journeyman may not presently be able to do building trade work, he can fairly readily acquire the ability to do building trade work in the same sense that *Teamsters* said the general public was able to "readily acquire" the skill of driving a truck. *See* 433 U.S. at 308 n. 13, 97 S.Ct. 2736. Without specific information on how difficult it is to learn to drive the type of trucks involved in *Teamsters*, an informed comparison is precluded. Nonetheless, the need for a month or months of on-the-job training and skill adjustment seems inconsistent with the dictionary definition of "readily": ". . . without hesitating . . . or delaying . . . with fairly quick efficiency; without needless loss of time . . . with a fair degree of ease . . ." *Webster's Third New International Dictionary* 1889 (1966). Nor is there any evidence that building contractors seeking sheet metal journeyman would employ persons able to "readily acquire" the journeyman's skills with a month or more of training rather than a person now able to do the job. The plaintiff's argument is not supported by the evidence in this case.

The plaintiff's attempt to count shipyard employees in the comparison work force is also undermined by its own expert who testified that only persons able to do the job properly without additional training or experience should be included in the relevant work force (10A Tr. 31–32; 9 Tr. 150).

*(3) Comparison and Finding*

■ Shipyard sheet metal journeyman workers do not possess the qualifications of skill and training possessed by building

trade sheet metal journeyman. Moreover, in the absence of data revealing the proportion of blacks (15–20) in the total (unknown) work force of shipyard sheet metal journeyman, the consideration of the 15–20 blacks only is insufficient to establish a prima facie case in this manner.

## D. U. S. CENSUS OF OCCUPATIONS

Statistics from the 1970 U. S. Census were introduced into evidence by plaintiffs on the numbers of black and white persons in three U.S. Census Bureau occupation categories: roofers and slaters; sheet metal workers and tinsmiths; and welders and flamecutters (PX 184 (marked, numbered, and discussed as PX 183 in 9 Tr. 95–195, but renumbered PX 184 at 10A Tr. 2); 10A Tr. 126–27). The defendant refused to stipulate to the relevance of the occupation statistics.

### (1) Occupation Statistics Alone

In his testimony Mr. Jon Priebe, a supervisory statistician in the labor force statistic branch of the Census Bureau, explained that the classification into an occupation category is based on a respondent's free-form answers to three questions,[9] (9 Tr. 91, 105); and that no definitions are provided to guide the respondent's answers (*id.* 92, 100, 105, 108, 136–137). As to the occupational classification for "sheet metal workers and tinsmiths", Mr. Priebe testified that apprentices were included in the tabulation (9 Tr. 101); that the classification included persons working in the building industry (Industry Code 67), but that it also included persons from the aircraft industry (I.C. 227), the fabricated structural metal industry (I.C. 158), and several other industries (See *id.* 101–113, 136–138).[10] Some of the "sheet metal workers and tinsmiths" are

**9.** Mr. Priebe testified that:

"In terms of industry and occupation, for occupation we asked three basic questions: what kind of work was he doing; what were his most important activities or duties; and what was his job title. Those three questions were based in the 1970 census to collect information to satisfy occupation."
9 Tr. 91–92.

**10.** The occupation listed in the "sheet metal workers and tinsmiths" classification are:

"535 Sheetmetal Workers and Tinsmiths

| | |
|---|---|
| Air-conditioning installer sheet metal | Sheet Metal |
| Aircraft metalsmith | Metal-ceiling builder (B) |
| Angle bender—227 | Metal ceiling hanger (B) |
| Assembler—Sheet metal—227 | Metal worker—D, 608 |
| Aviation metalsmith | Metal worker—B exc. roofing, 067 |
| Beam man—227 | Metal worker—sheet metal shop 158 |
| Ceiling installer—Metal ceiling B | Metalsmith—Exc. 228 |
| Chute Builder—158 | Pattern cutter—158 |
| Coppersmith | Pattern developer—158 |
| Cornice maker—Exc. 158 | Sheet ironworker |
| Cowlman—227 | Sheet metal erector (B) |
| Duct installer, air cond. or heating | Sheet metal fabricator |
| Duct installer, metal work | Sheet metal former—227 |
| Duralumin metalworker—227 | Sheet metal installer |
| Extrusion former—227 | Sheet metal lay-out man |
| Fairing man—227 | Sheet metal operator 227 |
| Furnace installer, sheet metal work | Sheet metal smith |
| Gutter hanger (B) | Sheet metal technician B–067 |
| Gutter installer (B) | Sheet metal worker |
| Layer-out sheet metal work 158 | Spouter sheet metal worker |
| Layout man—227 | Spouting installer B–067 |
| Layout man Sheet Metal 158 | Template fitter—227 |
| Mechanic | Template layout man 227 |
| Air Duct | Tin worker—B,067 |
| Dural 227 | Tinker—(759) |
| Duralumin 227 | Tinsmith |
| | Whitesmith" |

PX 184, at 0–61 and VII–IX.

journeyman level sheet metal workers in the building industry, but their number and the racial composition of that number are not established by the evidence. There is no evidence that the skills of sheet metal workers in these other industries are more similar to the skills in the building trade than the skills of the shipyard sheet metal workers. Comparison of Local 122's actual work force to aircraft workers, therefore, is no more permissible than a comparison to the shipyard workers.

The occupational classification "roofers and slaters" includes all roofers no matter what type of skill they may possess—sheet metal, slate, tile, tar—although at least they all seem to work in the building industry (9 Tr. 121–122).[11] There was no effort by plaintiff to identify the journeyman sheet metal worker component of this classification.

The occupational classification "welders and flame-cutters" included persons working with sheet metal in the building industry, persons working with other metals in the building industry, and still others in other industries (9 Tr. 122–125).[12]

11. The occupations listed in the "roofers and slaters" classification are:

"534 Roofers and Slaters

| | |
|---|---|
| Applicator—Roofing B,067 | Roofing applicator—B,067 |
| Composition roofer | Roofing layer—B,067 |
| Gravel roofer—B,067 | Slate roofer—B,067 |
| Hot-tar roofer—B,067 | Slater—B,067 |
| Metal roofer—B,067 | Tar roofer—B,067 |
| Metal worker—Roofing co.B | Tile roofer—B,067 |
| Roofer—B,067 | Tin roofer—B,067" |
| | PX 184, at 0–61, VII–ix. |

12. The occupations listed in the "welders and flame-cutters" classification are:

"680 Welders and Flame-Cutters

| | |
|---|---|
| Acetylene burner | Electric-spot welder |
| Acetylene cutter | Electric welder |
| Acetylene operator—228 | Face hardener—D,139–238, 759 |
| Acetylene torch burner | Filament welder |
| Acetylene torch operator | Flame burner |
| Acetylene torch solderer | Flame cutter |
| Acetylene welder | Flash welder |
| Aluminum welder | Gas brazier |
| Apprentice welder | Gas-burner operator |
| Arc Cutter | Gas cutter |
| Arc Welder | Gas-torch brazier |
| Atomic welder | Gas-torch solderer |
| Bar welder | Gas welder |
| Bit welder | Getter welder |
| Blade man—227 | Gun welder |
| Blow-torch burner | Heliarc welder |
| Blow-torch operator | Helium-arc welder |
| Body welder | Hookman—227 |
| Boiler welder | Inspector welding |
| Bonder—047–057, 408 | Iron cutter—557 |
| Bondman—048 | Lap welder |
| Brazer | Machine welder |
| Braizer | Maintenance welder |
| Burner—D,139–148, 169–238, 149, 55 | Material reclaimer—377 |
| Butt welder | Mechanic Tank truck, exc. engine |
| Combination welder | Metal welder |
| Cutting-torch operator | Oxyacetylene burner |
| Die welder | Oxyacetylene cutter |
| Dip brazier | Oxyacetylene-torch operator |
| Electric-arc welder | Oxyacetylene welder |

The plaintiff's own welding expert testified that it would take three weeks of regular eight hour days of work for a heavy metal welder to qualify as a sheet metal welder. (7 Tr. 28–30). Moreover, on cross-examination plaintiff's sheet metal expert conceded that a person fully qualified as a sheet metal welder through special training was not, in his opinion, properly classified as a journeyman sheet metal worker (8 Tr. 52). This opinion is consistent with the defendant's position about the building trades generally (12A Tr. 16–18 (Mr. Courtney, President, Baltimore Building Trades Council)) and about Local 122 in particular (14 Tr. 64–71, 75–81 (Mr. Wilford, Local 122's current business manager's explanation of test for knowledge of person seeking to be Local 122 journeyman with specialty in welding)). The plaintiff has apparently conceded this issue (14 Tr. 145–146).

■ Each occupation statistic includes persons who do not have the skills of a journeyman sheet metal worker in the building industry, and each occupation statistic includes persons who do not have the required skills. This court finds on the facts and evidence of this case that the tabulations of U.S. Census data for the Baltimore SMSA identified only by race

and by U.S. Census occupation classification are not persuasive evidence of the numbers of black and white persons in the Baltimore SMSA who are journeyman level (or any skill level) sheet metal workers in the building construction industry (*See* 10A Tr. 46–48).

Relying on *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), and *Teamsters*, 431 U.S. at 342 n. 23, 97 S.Ct. 1843, the plaintiff has argued that the occupation statistics were the only statistics available to prove its statistical case and that the extreme underrepresentation of blacks in the defendant's membership obviates the need for finely tuned statistics. Initially, the plaintiff's premise that its occupation statistics were the only ones available is contradicted by the U.S. Census Bureau's supervisor statistician. With respect specifically to the sheet metal occupation statistics, Mr. Priebe testified that upon request the Census Bureau could have prepared a tabulation for the Baltimore SMSA identified by occupation, race, *and industry* (9 Tr. 139–145). Data identified by geographic area, by race, by occupation (sheet metal worker), and by industry (building) were available to plaintiff if requested, but

| | |
|---|---|
| Oxygraph operator | Steel burner |
| Oxyhydrogen welder | Steel cutter—B,067, 068 |
| Pantograph-machine operator, welding | Steel welder |
| Pantograph operator, welding | Stitch welder |
| Pipe welder | Tack welder |
| Polygraph operator 228 | Tank welder |
| Racking-machine operator 228 | Thermite man |
| Radiagraph operator 228 | Thermite welder |
| Rail bonder | Torch burner |
| Resistance welder | Torch welder |
| Roller-seam welder | Torchman |
| Scrap burner—D,139–238, 759 | Unionmelt operator—228 |
| Scrap cutter—559 | Weld-layout man |
| Scrap-iron cutter 559 | Welder, any article |
| Scrap-metal burner 559 | Welder operator |
| Sheet-metal welder | Welding estimator |
| Shotweld operator 227 | Welding machine operator |
| Silver brazer | Welding specialist |
| Silver solderer | Welding tester |
| Spot welder | Wire welder |

PX 184, at 0–91 to 0–92, VII–ix.

they were not offered. An inference strongly adverse to plaintiff would be justified to the effect that if produced, the statistics would have shown few black building trade sheet metal workers. But in this case the court believes the omission of this evidence resulted from inadvertence rather than design and will draw no adverse inference from the omission alone. The potential existence of this evidence does, however, lead this court to reject the plaintiff's urgings to rely on the occupation statistics here as the only data available.

Three important distinctions between this case and *Castaneda* and *Teamsters* should be noted. First, unlike *Castaneda*, in this case the defendant has demonstrated quite persuasively that the occupation statistics are not an accurate count of the persons with the skills pertinent here. *See* 430 U.S. at 487–488, 97 S.Ct. 1843. Second, unlike *Castaneda's* statistical analysis of the general population for purpose of grand jury service, a duty falling upon citizens equally, in this case, as in *Educational Equality League's* concern for persons with specific qualifications, the requirement of identifying persons with the skills of journeymen sheet metal workers in the building trade must be heeded by the court and the plaintiff. Third, unlike the ability to drive a truck already possessed by defendant's own minority employees and by the general population in *Teamsters*, the skills of a sheet metal journeyman are not widely possessed but are generally acquired through long periods of apprenticeship training.

The plaintiff's occupation statistics from the U.S. Census do not establish persuasively a reliable basis for a statistical analysis or comparison of Local 122's membership and a relevant labor force.

## E. GENERAL POPULATION

The plaintiff has not shown by a preponderance of the evidence that the skills of a sheet metal journeyman in the building industry are already possessed or can be readily acquired by members of the general population. On the contrary, the evidence establishes that a substantial degree of skill and training is required. Accordingly, on the facts of this case and for the reasons explained in Part IV, A, *supra,* a comparison between the general population and Local 122's actual work force does not support any inference of a pattern and practice of disparate treatment of blacks by Local 122 since 1965, nor does it support an inference of disparate impact on blacks of any of Local 122's employment practices since 1965.

Plaintiff has cited several lower federal court decisions for the proposition that general population statistics when compared to low numbers of blacks union membership establishes a prima facie case of racial discrimination. The citations rest on a misapprehension of the use of statistics in those cases.

In a pattern and practice suit brought by the EEOC against the sheet metal workers local union in New York City, liability was determined by the court to exist from proof of disparate treatment of blacks in several ways as well as from proof of a large number of qualified black sheet metal workers in other local unions of the same International Association of Sheetmetal Workers in the same geographical area. After liability had been established, black representation in the general population was used as a goal for future black representation in the defendant local in the court ordered affirmative action plan. *EEOC v. Local 638 . . . Local 28, S.M.W.I.A.,* 401 F.Supp. 467, 482–487 (findings of fact and conclusions of law), 421 F.Supp. 603, 606, 617 (relief) (S.D. N.Y.1975) (Werker, J.) *aff'd with two modifications,* 532 F.2d 821, 824–827, 832 (2d Cir. 1976), *on remand,* unreported order (S.D. N.Y. January 19, 1977), *aff'd,* 565 F.2d 31, 35–36 (2d Cir. 1977). In many of the other cases relied upon by plaintiff, analysis discloses similar weakness of the cases as authority for the broad proposition for which they were cited, *e. g. EEOC v. Local 638, Enterprise Ass'n of Steamfitters,* 360 F.Supp. 979, 989–990 (S.D.N.Y.1973) (New York City Steamfitters case) (reliance on both disparate treatment and disparity between local membership and general popu-

408

lation), *aff'd and remanded*, 501 F.2d 622, 632–633 (2d Cir. 1974) (use of percentage goal for representation as relief affirmed, but remanded for reassessment of 30% figure based on general population to "most precise standards and statistics available", suggested to be 19.79% labor force (excluding children, women, retired persons) (no appeal of liability), *on remand*, 400 F.Supp. 983 (S.D.N.Y.1975) (26% found to be appropriate *goal*); *United States v. Local 638 . . . Local 40, B.S.O.I.W.*, 347 F.Supp. 169, 180–182, 184–185 (S.D.N.Y.1972) (New York City ironworkers case) (artificial limit to union size, referral hall preference for current white membership, no membership representation goal decreed); *Equal Emp. Opportunity Comm. v. Local 5, International Ass'n of Elevator Constructors*, 398 F.Supp. 1237, 1252 (E.D.Pa.1975) (Philadelphia Elevator case) (general population used since no special qualification required, disparate treatment, goal set), *aff'd* 538 F.2d 1012 (3d Cir. 1976); *United States v. Local 169, Brotherhood of Carpenters and Joiners*, 457 F.2d 210 (7th Cir. 1972) (disparate treatment in referral, nepotism, refusal to participate in state and contractor affirmative action plans, and uncertain reference to general population statistics); *United States v. Local 86, B.S.O.R.I.W.*, 315 F.Supp. 1202 (W.D.Wash.1970) (four cases; ironworkers, sheet metal, pipefitters, electricians) (disparate treatment, general population statistics noted but not relied on), *aff'd* 443 F.2d 544, 550–551 (9th Cir. 1971) (not faced with case where court has relied on statistics alone); *United States v. Local 1, B.S.O.I.W.*, 438 F.2d 679, 680 (7th Cir. 1971) (Chicago ironworkers case) (reversing District Court's pretrial dismissal for Attorney General's refusal to produce documents bearing on his 42 U.S.C. § 2000e–6(a) "reasonable cause" determination)).

*F. COMPOSITE STATISTICS*

Notwithstanding the deficiencies found in the U.S. Census statistical data offered by plaintiff, an effort could be made to develop from the evidence in the record a composite statistic on which a statistical analysis could be based. One primary problem

with such a *sua sponte* revision, reorganization, and reconsideration of the evidence introduced at trial in open court as required by F.R.Civ.P. 43 is that the defendant might be deprived of its opportunity to meet and rebut the evidence and factual arguments adduced against it. Moreover, although accurate addition and division of the numbers in evidence is within the court's ability, the testimony in this case illustrates convincingly the meaninglessness of a simplistic manipulation of numbers without careful evaluation of the source and foundation of those numbers and of the skills and qualifications of the persons counted. *See Educational Equality League*, 415 U.S. at 619–621, 94 S.Ct. 1323; *Lewis v. Tobacco Workers' International Union, supra; Roman v. ESB, Inc., supra.*

In any event, such a composite statistic would not support the plaintiff's position. There are 21 black sheet metal workers in the jurisdiction of Local 21, many of whom would be qualified as journeymen in the building trade. That number, 21, might be the numerator on one side of a ratio as to which the denominator would be the total number of sheet metal workers in the Baltimore area in the building construction industry. A total of 2112 persons (of which 93 were black and a number were apprentices were counted as sheet metal workers and tinsmiths by occupation by the Census Bureau (PX 184; St. 189). If the inclusion of the unqualified in, and the exclusion of the qualified from, that number were ignored (or assumed without any foundation to compensate for each other) and if the 72 (93–21) blacks not shown to qualify are eliminated from both the numerator and the denominator, then blacks represent 1.03% ($^{21}/_{2040}$) of the composite statistic, or to put it another way, of the persons who *might* be journeymen sheet metal workers in the building trade in the Baltimore area. At this point it is appropriate to observe that blacks constitute 1.4% ($^{4}/_{280}$) of all persons admitted to the union from 1960 to 1975 (St. 210), and that Local 122 has made in 1971 (before this suit) and in 1977 efforts to organize a nonunion sheet metal shop

employing 11 other black journeymen (*See* Part VII, *infra*). In the context of these admission and recruitment statistics, the disparity between the 1.03% composite statistic and the 1.71% (⁴⁄₅₄₈), current representation of black journeymen and handymen in Local 122 (Part II, *supra*), does not persuade this court by a preponderance of the evidence that Local 122 since 1965 has treated blacks differently from whites or has used employment practices that fall more harshly on blacks as a group than on whites as a group.

Plaintiff's expert in labor economics testified that if the relevant labor market for journeymen sheet metal workers in Local 122's jurisdiction included as little as one-half of one percent (0.5%) blacks, a statistically significant disparity would exist between that relevant labor market and the black membership in Local 122 (0 out of 598 as of January 1, 1974) (10A Tr. 39–41). In the circumstances of this case, this comparison is not persuasive, in large part because in 1971, Local 21 attempted to organize a nonunion shop with 11 black journeymen. The Local's inability to do so then or in 1977 illustrates a factor in the definition of the available work force to which the plaintiff has paid no attention. This factor ignored by the plaintiff is the dichotomy between non-union and union shops. If an individual does not desire to join a trade union because he prefers the advantages of non-union work over the advantages of union work, the union cannot be faulted for excluding that individual from its membership. The fact that a black person is not a member of a union cannot, in short, *ipso facto* mean that he has been excluded through racial discrimination since there may be many reasons, completely independent of racial factors, why he has not sought to join.

For all these reasons, a hypothetical composite statistic does not establish plaintiff's prima facie case in the circumstances of this case.

### G. *LOCAL 122's MEMBERSHIP AND STATISTICAL DISPARITY*

There are very few blacks in Local 122 (*See* Part II, *supra*). The plaintiff, however, has not shown that there is a large pool of qualified, available, union-minded, and black journeymen in the jurisdiction of Local 122. Only six black men claiming to be journeymen testified.

Two were not qualified; two worked in the ship yard; one was in Local 122; and one, an employee in the nonunion shop that Local 122 has tried to organize, declined an offer to sign up and help unionize his shop (*Id.* 15 Tr. 50). At best plaintiff showed 21 blacks who might be qualified journeymen in the building trade.

In the context of this small sample, the value of the statistical comparisons proposed here is minimal. As Chief Judge Brown wrote:

"While we recognize that ' "[s]tatistical analyses have served and will continue to serve an important role" in cases in which the existence of discrimination is a disputed issue,' *Teamsters v. United States*, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396, 417 (1977), we do not find error in the District Court's determination that the statistical disparities revealed here, considered in the context of 'all of the surrounding facts and circumstances,' 431 U.S. at 340, 97 S.Ct. at 1857, 52 L.Ed.2d at 418, do not constitute a prima facie showing of discrimination. The numbers concerning the Historical Research Center are drawn from a pool too small to produce highly valuable evidence. *See Teamsters v. United States, supra*, 431 U.S. at 339, 97 S.Ct. at 1856 n. 20, 52 L.Ed.2d at 418 n. 20. Moreover, as the Supreme Court has noted, 'such general determinations, while helpful, may not be in and of themselves controlling as to an individualized hiring decision, particularly in the presence of an otherwise justifiable reason for refusing to rehire.' *McDonnell Douglas Corporation v. Green, supra*, 411 U.S. at 805 n. 19, 93 S.Ct. at 1826, 36 L.Ed.2d at 697 n. 19. The evidence as to the comparisons among the candidates for the promotion leads us to hold that the District Court Judge was

warranted in concluding that discrimination was not a reason for refusing to elevate plaintiff to the archivist position. The statistical disparities are not sufficient to overcome this conclusion or independently to constitute a prima facie case of sex discrimination."

*Adams v. Reed*, 567 F.2d 1283, 1287 (5th Cir. 1978).

 In the circumstances of this case, the plaintiff has not shown by a preponderance of the evidence that any disparity exists between the black membership in defendant Local 122 and black representation in the qualified, available, and willing work force.

## IV.

### SHEET METAL JOBS GENERAL

Sheet metal contractors who have collective bargaining agreements with Local 122 may hire persons, who are already union members, either by hiring them directly or by contacting officials of Local 122 for names of union members available for employment (St. 258). Unionized sheet metal contractors, with few exceptions, hire only members of Local 122 (St. 259).

In two instances, once in 1971–73 and again in 1974, union sheet metal contractors working on federal government construction projects hired Mr. Witherspoon, a black person, as a journeyman level sheet metal worker notwithstanding his lack of union membership, his lack of tools in the 1971–73 instance, and his lack of journeyman level skills. These actions were taken to satisfy the demands made by Government contracting offices, who put significant pressures on contractors to hire black journeymen sheet metal workers (*See* 13 Tr. 26–30 (Warren-Ehrst-Linck Co.'s job at the U.S. Naval Academy); 14 Tr. 39–42 (Lloyd E. Mitchell Co.'s Social Security Administration Building job); 14 Tr. 136–140 (former government officer). Local 122 did not object to or hinder these actions (13 Tr. 30 ("Q: Did the Union try to stop you from hiring him" A: No, I had their blessing."); 14 Tr. 40.

Local 122 members who desire employment in the sheet metal industry may solicit employment directly from sheet metal contractors or may notify officials of the union that they are out-of-work and available for employment (St. 260). As a black journeyman member of Local 122 testified, "it's standard practice that it is left up to journeymen, if they want to seek out a particular employer to find a job" (8 Tr. 99). Officials of Local 122 dispense information about the work status of any of its individual members if such information is requested by a sheet metal contractor (St. 261). Approximately 95% of sheet metal positions with sheet metal contractors are filled directly by the contractors (St. 262).

The Trade Rules and By-Laws require all members of Local 122 who begin, terminate or change employment to notify the office of the Business Representative within 24 hours, but this requirement was not generally followed in the past (St. 263). Sheet metal contractors are required to report changes in personnel and layoffs of personnel, but they do not report such matters consistently (St. 264).

At the time this EEOC suit was brought in January, 1974, Local 122's members were enjoying a period of high employment, compared to the period since then. At one time in 1976, unemployment among Local 122's membership approximated 65% (12B Tr. 99–100).

Under the collective bargaining agreement to which Local 122 is a party, employees of a union contractor must be either a member, a registered apprentice or a temporary permit holder (PX 79, Art. 11, at 4; St. 275).

No evidence in this case suggests that Local 122 members refuse to work on the same jobs as sheet metal workers hired by an employer without prior union permission. Indeed, in so far as there is any evidence, Local 122 appears to acquiesce in contractor hiring decisions, including a decision to hire outside the union (14 Tr. 26). Such condition varies considerably from the factual setting in *EEOC v. Local 638 . .*

*Local 28, S.M.W.I.A., supra,* where Judge Werker found that Local 28 had substantial if not total control of union sheet metal jobs because it refused to work on the same job with sheet metal workers who were not Local 28 journeymen or apprentices or who had not prior to being hired obtained Local 28's permission to work. 401 F.Supp. 472–474. Judge Werker found that the practice of Local 28 interfered with the contractor's efforts to meet the contractual affirmative action plan obligations, *id.* at 474. Local 122 does not exercise the same control over union sheet metal work in its jurisdictional area as New York City's Local 28 exercises in its area.

## V.

### OUT–OF–WORK LISTS

Based on the information it receives from its members and sheet metal contractors, Local 122 maintains an out-of-work list, which consists of names of unemployed union members, enumerated in the order that their names become available to officials of Local 122 (St. 266; PX 104). The list is not complete (St. 263–264).

A sheet metal contractor who wishes to hire someone whose name appears on the out-of-work list may call, but is not required to call, Local 122 for available workers (St. 267). The local union's out-of-work list is not the exclusive source of the names of out-of-work union members for contractors, nor is it the exclusive vehicle for obtaining a job by unemployed union members. Approximately 95% of the sheet metal jobs are filled directly by the contractors (St. 262).

When a sheet metal contractor uses Local 122's out-of-work list, at his option, he may (a) request that a certain individual on the out-of-work list, regardless of his position on the list, be notified to report for work; (b) ascertain that a certain individual is on the out-of-work list, and then offer employment to that person directly; (c) request that he be sent a certain number of workers with certain qualifications; or (d) request workers generally (St. 268). If a sheet met-

al contractor requests that a certain individual be notified to report for work, as in situation (a), *supra,* the Business Manager or Representative of the union complies with the request, regardless of where that person's name appears on the list (St. 270). When requests for specific workers are made or when requests for workers are made generally by sheet metal contractors, as in situations (c) and (d), *supra,* such requests are processed by the union Business Manager or Representative (St. 269). In situations (c) and (d), *supra,* officials of Local 122 use their discretion in deciding what people should be taken off the out-of-work list to fill a particular job. No written rules govern this determination (St. 272). Stipulation 271 states: "If a sheet metal contractor requests a certain number of workers with a given specialty, the Business Manager or Representative will suggest that the contractor hire the first people on the list whom the official feels meet the employer's qualifications." The court infers from this stipulation (in the absence of other evidence) that in situations (c) and (d), *supra,* the union officials' discretion is guided by an unwritten rule that the person who is both qualified and listed highest on the chronologically ordered out-of-work list shall be suggested to the contractor.

There was testimony by Melvin Robinson, a black journeyman member of Local 122, that from January, 1975, when he was laid off by one union contractor, to the date of trial, October, 1977, he was "not directly" referred out for work by Local 122, although he did have one possibility in the summer of 1977 (8 Tr. 95–99). The plaintiff EEOC proffered to show that other similarly qualified white journeymen members of Local 122 were referred out to the exclusion of Mr. Robinson or that they were referred out for longer periods than Mr. Robinson (8 Tr. 97–98). The proffer was not met directly by the plaintiff.

Mr. Robinson testified that during the same time period that he was laid off, he knew approximately 14 journeyman members of Local 122, including the Local's president, who were also laid off by sheet

metal contractors in Local 122's area of jurisdiction and who instead were employed—as he was—at the Bethlehem Steel Key Highway Shipyard (8 Tr. 103). At one time in 1976, as much as 65% of the total membership of Local 122 was unemployed (12B Tr. 99–100).

Between 1975, the year Mr. Robinson was laid off, and 1977, total union membership declined from 602 to 544 (St. 213, Table VII). Both black journeymen and white journeymen withdrew from the union for lack of work (id.; 8 Tr. 100–101; 15 Tr. 44–45).

The plaintiff has referred the court to *United States v. Local 638, supra,* the New York City steamfitters' case. There the court found that Local 638 had violated Title VII by admitting whites who had not graduated from the apprenticeship program nor passed a journeyman examination but not admitting black and Spanish-surnamed steamfitters already employed as journeymen, 360 F.Supp. at 989, and by passing notice of job openings by word-of-mouth from the almost all white present and past members responsible for hiring for the contractors to, the court inferred, other white members. About the work referral practice, Judge Bonsal wrote:

"The general practice in the steamfitting industry is for contractors to maintain steady crews of men, which are shifted from site to site as construction needs change. When additional men are needed, site foreman or superintendents generally hire men from among those who apply for work by visiting the sites and contacting the foremen. Steamfitters learn of openings by contacting A Branch members who are working on sites needing men or who hear of openings; occasionally they seek the help of Local 638's business agents or officers.

"Local 638, however, does not maintain a hiring hall, nor is there any formal referral mechanism or service in the industry in New York City. Local 638 does not keep formal records of available jobs nor of steamfitters seeking work. The foremen and on-site superintendents, who occasionally hire steamfitters to supplement their regular crews, are for the most part white, and, as the evidence at trial indicated, many are present or former members of the A Branch of Local 638. In addition, at least 11% of the members of the A Branch as the commencement of the present actions are related by blood or marriage to other members of the union.

"While *there is no evidence that either Local 638 or MCA has engaged in purposeful discrimination against nonwhites the conditions of the industry set forth above, in combination with the history of discrimination in admissions to the A Branch of Local 638, give whites advantages in obtaining employment.*"

360 F.Supp. at 990 (footnotes omitted) (emphasis added). In the *Local 638* case as in the present case, there was no direct evidence of disparate impact. In *Local 638* disparate impact was inferred (1) from the disparate treatment of nonwhites in the admission process into the union; (2) from the fact that a union steamfitter would learn of the job openings primarily from other union men on the regular crews of a contractor; (3) from the fact that the hiring foremen were for the most part white and present or past union members; and (4) from the fact that many of the union members were related by blood or marriage, all circumstances tending to increase the availability of employment opportunities of whites while decreasing them for blacks. Some of these circumstances do exist in the present case in that in Local 122 vacant jobs are largely filled by journeymen approaching contractors directly; and many members of Local 122 are related to each other. Still there are crucial differences in the circumstances existing in the present case and those in the New York steamfitters case.

In the present case there has been no evidence of a disparate treatment of blacks in the requirements for admission into Local 122 since 1965. Furthermore, as previously noted, in the present case the evidence has disclosed the existence of less

than 21 qualified black sheet metal journeymen within Local 122's area while in the *Local 638* case there were at least 160 qualified black journeymen in the steamfitters trade who were potentially being denied the opportunity for union work as a result of the methods of dissemination of information about union jobs practiced there.

██ Plaintiff's reference to a case where the evidence justified the inference of disparate effect is not evidence of such an effect in this case; indeed, the comparison highlights the absence of crucial evidence in this case. Weighing the evidence in this case, this court finds the plaintiff has not shown by a preponderance of the evidence that Local 122 engages in a pattern and practice of treating white journeymen differently than black journeymen or that Local 122's facially neutral out-of-work list practice has had a disparate impact on black compared to white journeymen to date.[13]

## VI.

### FOUR WAYS INTO LOCAL 122 MEMBERSHIP

There are four ways in which an individual may achieve sheet metal journeyman membership in Local 122:

(1) Transfer from another local of the International;

(2) Direct admission, upon fulfilling certain requirements and achievement of a satisfactory score on a journeyman examination;

(3) Successful completion of the JATC Apprentice Program;

(4) Organization of a company or contractor of which a journeyman is an employee.

The two major methods of admission are (2) and (3) above (St. 208).

Of the 610 active and retired members of Local 122 as of 1975, the method by which those persons obtained membership was reported by Local 122 in answers to Interrogatories as follows:

| | |
|---|---|
| Graduated JATC Program | 237 |
| Direct Admission | 243 |
| Transfers | 29 |
| Unknown | 101 |
| Total Members | 610 |

At least 280 such members entered the local union between 1960 and 1975 by either direct admission, completion of the apprentice program, or transfer from another local (St. 209). Of these, 276 or 98.6% were white, and 4 or 1.4% were black (St. 210).

Local 122 has generally had a practice and policy of admitting only enough new journeymen members to replace those who have ceased to be active journeyman members of the union (St. 211). During the period 1965–74, Local 122 did not recruit any journeyman members, black or white, through any publicity program such as newspaper or radio advertising, nor through contact with high school counseling programs or civil rights groups such as the Interdenominational Ministerial Alliance.

### A. TRANSFER

There was no evidence that a black journeyman sheet metal worker has attempted to transfer into Local 122 from another local of the International Union, nor was there testimony on the practices and procedures involved in the process of transfer.

In 1974 or 1975, the International Union asked Local 122 to merge with Local 557, a production local whose members worked in the sheet metal shops of two Baltimore area companies, and to accept into Local 122 the approximately 90 members, about half of whom were black workers, of Local 557. The defendant Local Union membership and its officers voted to take in the ninety member sister local. Prior to the dissolution of Local 557, one of its two employer companies, Koppers Company, transferred the sheet metal shop organized by Local 557 into another plant organized by the United States Steel Workers; consequently, those employees were required to join the steel

---

**13.** In the future circumstances may change, and such a disparate impact may develop, especially as more black journeymen enter Local

122. Defendant's counsel should advise it about the possible future consequences of the use of these practices.

**414**

workers union, and the sheet metal local unions lost jurisdiction over them. The members of Local 557, including its black members, employed at the other union company were accepted into Local 122 (12B Tr. 106–109). As of October 3, 1977, the start of the trial, there were four black production workers in Local 122 (14 Tr. 63; St. 213; Table VII).

■ The plaintiff has not shown that defendant Local 122's practices governing transfers into Local 122 from other locals have a disparate impact on, or result in disparate treatment of, blacks.

## B. DIRECT ADMISSION

### (1) Generally

Persons wishing to become journeyman members of Local 122 through direct admission must pick up written applications at the union business office (St. 222; PX 95–96). If a person inquires at Local 122's office about submitting an application for direct admission as a journeyman to Local 122 or about Local 122's admission requirements generally, the two secretaries in the office, one employed since 1968 by the Joint Apprenticeship Training Committee (JATC) and the other employed since 1970 by Local 122, have general instructions to refer the person to the business agents of Local 122 (13 Tr. 47, 50 (Ms. Smith, JATC); 13 Tr. 70, 71–76 (Ms. Fickus, Local 122); 12B Tr. 87 (Mr. Russell, Business Agent)).

From and including 1966 through the end of 1975, Local 122 had directly admitted 89 whites and 0 blacks to its active membership. No one was directly admitted in 1974 (St. 249). The years in which these individuals were admitted are as follows:

| | |
|---|---|
| 1966 | 6 |
| 1967 | 19 |
| 1968 | 18 |
| 1969 | 7 |
| 1970 | 8 |
| 1971 | 20 |
| 1972 | 5 |
| 1973 | 5 |
| 1974 | 0 |
| 1975 | 1 |
| Total | 89 |

### (2) "Walk-In" Application for Direct Admission

The plaintiff has offered testimony about two alleged incidents of disparate treatment of blacks seeking to apply for direct admission into Local 122 by walking into the office: one in 1963 involving Mr. George Winkie, and the other in 1971 or 1972 involving Mr. David Lee Anderson.

*George Winkie*

Mr. George Winkie, a black journeyman sheet metal worker, testified that in 1963 he visited a local union office on North Avenue and asked a stout man sitting at a desk inside the front door how to join the local, that he was first told the local was "not taking members," [14] but that after he insisted on applying the stout man said "we do not accept colored people in this Local." (2 Tr. 78, 82–85, 93–94).

The defendant has tried to impeach Mr. Winkie's testimony on five points. First, for some time prior to July 1964, the principal place of business of Local 122 was located at 1131 Harford Road, Baltimore, Maryland, in a black neighborhood (St. 191). The building in which Local 122 was located was a small fifteen feet wide, two story rowhouse, next to the thirty-three feet wide, two story Plumber's Hall (DX 91–93, 12B Tr. 77–30). Since North Avenue, the east-west street mentioned by Mr. Winkie, crosses the 1800 Harford Road, a north-south street, about six or seven blocks from Local 122's 1963 office location, F.R.Evid. 201, the court finds no fatal inconsistency between the actual location of the Local's office and Mr. Winkie's recollection of where he went.

Despite the defendants' arguments to the contrary, Mr. Winkie's description of entering the Local's office directly into a room with a desk is consistent with the office layout related by Mr. Russell (12B Tr. 81–82; DX 93).

14. Plaintiff dismissed its allegation that the limit on Local 122's size violated Title VII. Paper 259; 15 Tr. 59–60. One white was admitted directly in 1963. St. 249.

Third, in his testimony in 1977 Mr. Russell protested that he would not be so "stupid" that in the middle of a tough black neighborhood he would tell a black that the Local does not take blacks (12B Tr. 94–95). The court takes judicial notice that in 1963 the relations between blacks and whites were very different from 1977. Mr. Russell's 1977 rationalization is too hypothetical to cast doubt itself on Mr. Winkie's testimony.

A fourth, more troubling point, is that Mr. Winkie could not identify anyone in the courtroom as the "stout" man although the two local business agents in 1963 were present in the courtroom at the time of the attempted identification. But fourteen years is a long time, and recollections inevitably fade over such periods of time.

The fifth, most troubling point, is Mr. Winkie's uncertainty that he inquired specifically at Local 122 at 1131 Harford Road rather than at the office of some other union located in the Plumbers Hall at 1133 Harford Road (2 Tr. 88, 92, 103–104), and in particular Mr. Winkie's statement that the plumbers or steamfitters were "sort [of] along with the sheet metal" in the same building (2 Tr. 88), an incorrect statement since Local 122 had the rowhouse at 1131 Harford Road to itself. In redirect on this final point, Mr. Winkie stated that he had been sent down to the local by a sheet metal mechanic in the building trade who was directing him to the sheet metal local and not to any other local union (2 Tr. 103–104).

Weighing all the evidence, the court finds it more likely true than not true that in 1963 Mr. Winkie did visit Local 122 to inquire about joining and that he was turned away because of his race.

*David Lee Anderson*

Mr. David Lee Anderson, a shipyard sheet metal worker, testified that in 1972, after reading newspaper reports about the related § 1981 case, he visited Local 122's union hall, that he asked the receptionist for an application for membership, and that she said that "at that time they didn't need any more members because they were filled up." [15] (8 Tr. 58–59, 63). The court believes that Mr. Anderson's description of the Local's new office at 4705 Erdman Avenue (*Id.* at 63–65), conforms well enough for five years after the visit to the actual office (DX 94; 13 Tr. 54–65; St. 190), and that Mr. Anderson did visit the office.

Ms. Fickus and Ms. Smith, the secretaries then and now employed at the 4705 Erdman Avenue office, testified that they have been instructed to refer requests for applications or inquiries about journeyman membership in Local 122 to a business agent and that they follow those instructions (e. g., 13 Tr. 49–50, 71–76). Ms. Smith, the JATC secretary, never handles Local 122 applications, but she refers inquiries to the business agent and sometimes hands out business cards (*Id.* at 49–50). She recalled several white men coming in over the years relative to an application for membership but did not recall a black man doing so (*Id.* at 49, 53). Ms. Fickus, the Local's secretary, testified truthfully, the court believes, about her general instructions and the fact that she followed them (*Id.* at 71, 72, 76). However, her testimony that she had never had someone walk in off the street and ask for an application to join Local 122 and that she had "never" seen a journeyman application form (*Id.* at 71, 74) seems an exaggeration, even though she did recall one or two telephone inquiries (*Id.* at 71).

Other circumstances generally pertaining to the activities at the 4705 Erdman Avenue office seem significant to the court in weighing the evidence about Mr. Anderson's inquiry. First, in 1972, 45 apprenticeship applications were submitted to the JATC by blacks in person at the same office, and an unknown number of JATC application forms (probably somewhat greater than 45) were given out at that office by both secretaries (St. 42, Table I; PX 6, 13 Tr. 48, 51). Second, it would be reasonable for Ms. Smith to assume that a request for "an application" by someone

---

**15.** Five white journeymen were admitted directly in 1972. St. 249.

appearing to be the right age would be a request for an application for the apprenticeship training program (13 Tr. 49). Third, in 1972 applications for the JATC program were accepted from January 1 to March 31 (*Id.*; St. 155), and a tardy applicant requesting an application form in August or September was not given such a form but, instead, was told to come back next year (13 Tr. 50). Fourth, Mr. Anderson was 29 in August—September, 1972 (8 Tr. 53), and perhaps still eligible by age for the JATC depending on his length of service in the armed forces (St. 67(d), 104(e)). Fifth, he "saw an article about the prejudice that was going on at [Local] 122" (8 Tr. 59), shortly after a private § 1981 suit related to this case was filed in August 21, 1972 (*Id.* at 62–63) and decided to go see for himself if it were true (*Id.* at 60). Sixth, he went to the "*union hall* on Erdman Avenue" (*Id.* at 58 (emphasis added)), and "asked the lady for an application for membership" (*Id.*). When he made the request, he did not ring the call bell to get a secretary to come to the credit union teller's glass window (8 Tr. 64–65; DX 94–94D; 13 Tr. 54–70). Instead, standing in the reception-waiting area room he got close to the window (8 Tr. 65) and made the request to a secretary who was standing (13 Tr. 68) in the front office. The front office is devoted to the mimeograph and addressograph machines, and a secretary is not usually in the front office unless she is operating the machines or is summoned by the call bell (13 Tr. 66–70). Seventh, the statement made by the female secretary to Mr. Anderson to the effect that "at that time they didn't need any more members because all of them were filled up" (8 Tr. 58–59) is ambiguous. Such a statement would have been factually correct if made to an applicant at that time for the JATC program. Such a statement might have been both factually and legally incorrect at that time in 1972 if made to an applicant to Local 122 seeking journeyman membership. Eighth, Mr. Anderson never thought the receptionist was in charge, figured she was doing her job, didn't ask to see anyone in charge, and

went away (8 Tr. 66), convinced in his mind of the truth of the newspaper report about the racial prejudice at Local 122. He stayed at the Erdman Avenue address only six or seven minutes (8 Tr. 64). Ninth, the plaintiff has, or should have, searched for and called to testify any other black journeyman who had been similarly treated, but only two testified for the fourteen year period from 1963 to 1977.

It is critical whether, on the one hand, Mr. Anderson communicated that he was a sheet metal *journeyman* and that he wished to apply for journeyman membership in the local union or on the other hand, whether he communicated only that he wanted to apply for membership—an ambiguous request. He intended to inquire about application to Local 122 as a journeyman (8 Tr. 66), but during the trial, witnesses and counsel often spoke, inaccurately, but understandably, of application to the JATC to be an apprentice as if it were synonymous with application to the local union (*See, e. g.*, 2 Tr. 14, 17, 39, 113; 3 Tr. 24; 4 Tr. 85; 5 Tr. 51, 86; 9 Tr. 44–45, 66–69, 71–72).

Weighing all the evidence the court has concluded that it is probable that Mr. David L. Anderson visited the Local 122 office in August—September, 1972, approached the glass window, and asked for an application; that the secretary, preoccupied with whatever other chore (e. g. mimeographing) had initially brought her into the front office, assumed the request was for an apprenticeship application, and told the 29 year old that "they didn't need any more because they [were] all filled up." Under those circumstances, the treatment of Mr. Anderson by Local 122 on that occasion was not intentional disparate treatment of him because of his race, but so far as the union was concerned routine treatment of another 29 year old asking for an application to the JATC too late. No request was made by Mr. Anderson to see the person in charge, the business agent, and in a six or seven minute visit the newspaper report of allegations of prejudice by Local 122 had been

confirmed in Mr. Anderson's mind—albeit in this instance incorrectly.[16]

### (3) Requirements for Direct Admission

Local 122 has formal procedures and requirements for seeking direct admission to Local 122 and, in addition, a general custom or practice which is, in effect, another requirement for admission.

#### (a) The Practices Challenged In This Case

Under the formal procedures and regulations of Local 122 a person seeking direct admission must obtain a written application form from the union business office (St. 222; PX 96–96). The application form, after having been completed by the applicant, must then be returned to the office and submitted by the business representative to the Executive Board of Local 122 for determination from the face of the application whether or not the initial requirements of a minimum age of 26 years and of a minimum work experience of four years in the trade have been met (St. 224–226, 230). If the initial requirements have been met, the Executive Board instructs the Examining Committee to administer a journeyman test to the applicant (St. 227). The Examining Committee recommends for or against admission based on the journeyman test results (St. 232), and the Executive Board then (although formal power exists to review the test) usually recommends to the full membership admission or rejection of the applicant in accordance with the Examining Committee's recommendation, subject to payment of the initiation fee and dues (10B Tr. 63–79; St. 228–229).

The plaintiff has dismissed with prejudice the challenge to these formal practices (See Part I, supra; Paper 259; 15 Tr. 59–60).

In addition to the formal procedures and requirements identified above, a general de facto custom or practice [17] [hereinafter the "union job requirement"] exists under which persons seeking to apply for direct admission as journeyman members of Local 122 must obtain work with a union sheet metal contractor and work for such contractor for a period of time prior to "applying" for membership (St. 242; 12B Tr. 87–88, 144–145). The union job requirement was described by the former Business Manager, Mr. Russell, as follows:

"Well, the policy was we would go out and we would talk to the person and tell them: first, we do not give direct applications into the union. There is two ways of coming into the union, and it would depend on how old the individual was who was applying, through either the apprentice program or, if he had a job with one of our employers, we would then let him—he would work and we would then observe him as to his ability as a sheet metal worker. We would talk with his employer, whoever he may be, and we would discuss it with the people that he works with. Now, after he had been there for a reasonable time, and sometimes we would evaluate him too quick, we would tell him, 'You may work for five to six months before you can make an application before you can join in.'" (12B Tr. 88–89).

The possibility that this facially neutral union job requirement results in a disparate impact on black journeymen applicants to

**16.** Mr. Anderson is not qualified to do building trade journeyman sheet metal work. *See* Part III B, *supra*; 8 Tr. 52, 67–71; 14 Tr. 61, 64–72, 75–84. Individually, therefore, he would not merit relief in any event, although of course his qualifications *vel non* are not pertinent to the disparate treatment allegation at the application stage.

**17.** The defendant urges that the plaintiff's dismissal of its Title VII challenge to Local 122's selection devices and requirements, Part I, *supra*, should preclude further consideration of

this practice. 15 Tr. 69–72. Since this practice is not among those listed in the written motion to dismiss or in the Pretrial Order paragraphs referred to therein, this court will consider the practice. However, since the practice was not identified as a possible basis of liability until post-trial argument, the Amended Complaint and Pretrial Order are deemed amended to conform to this evidence, and the court will consider below whether defendant has been prejudiced and should be permitted to introduce additional evidence. *See* F.R.Civ.P. 15(b), 16.

Local 122 arises from the interaction of this *de facto* requirement with the fact that contractors normally hire only union members (*e. g.*, St. 259; 14 Tr. 26). Hypothetically, the general custom requiring a job with a union contractor and the contractors' practice of hiring only Local 122 members, almost all of whom are white, together might have an adverse and disparate impact on black nonunion sheet metal workers qualified as journeymen in the building trade. The union might deny a person membership because he did not have a job with a union contractor, while contemporaneously the union contractor might deny the person a job because he was not a union member. In addition, it might be argued that knowledge of a vacancy on a union contractor's job might never spread outside the union's almost all white membership to the nonunion sheet metal workers, including the small number of black sheet metal journeymen.

### (b) The Evidence

Mr. Russell, a Local 122 officer for 22 years, testified that he did not think *anyone* had formally applied to Local 122 for direct admission who was not actually working for a union contractor (10B Tr. 107–109). As this deposition testimony was introduced by plaintiff and went uncontradicted and unexplained by either side, and as it is consistent with the other evidence, this court accepts as accurate the fact that no journeymen—white or black—has been allowed formally to apply for direct admission or has been admitted directly into Local 122 who was not then actually working for a union contractor. Accordingly, the plaintiff has not shown that the union job requirement has been used to treat black journeymen differently than white journeymen. No case of *intentional disparate treatment* in this respect has been made out.

As to the disparate impact prong of the plaintiff's theory, the evidence is similarly unavailing to the plaintiff. While it is true that the union contractors normally hire as journeymen only union members, the fact remains that on a substantial number of occasions non-union journeymen have been hired. It is stipulated that from January 1, 1966 through the end of 1975, 106 persons were admitted to the union via the direct admission process, (St. 249), a fact that demonstrates that on at least that many occasions union contractors had initially hired non-union members purporting to have journeyman level skills. It is not startling or unanticipated that a union contractor would normally hire a union member, but the evidence discloses, and the court finds, that union membership has not, either explicitly or impliedly, been an absolute prerequisite to the acquisition of a job with a union sheet metal contractor within the jurisdictional area of Local 122. In order for the union job requirement in conjunction with the normal hiring practices of the union contractors to be held under those circumstances to have had a disparate impact on black non-union sheet metal journeymen, there must be evidence of specific instances in which the system has, in fact, had a disparate impact on blacks.

The evidence in this case does not establish a single example of a situation in which the union job requirement, or the contractors' practice of generally hiring union journeymen, or both practices acting together have had an adverse and disparate impact on a black sheet metal worker. The testimony of the purported black sheet metal workers disclosed not one job application to a union contractor rejected because of lack of union membership. (*See* 2 Tr. 78–105 (Mr. Winkie) (pre-Title VII); 2 Tr. 109–154 (Mr. Williams); 7 Tr. 45–64, 78–97 (Mr. Campbell); 8 Tr. 52–72 (Mr. D. L. Anderson); 8 Tr. 75–119 (Mr. Robinson); 15 Tr. 14–30 (Mr. Evans); 15 Tr. 34–50 (Mr. Jackson)).

The plaintiff's position seems to be that the court should infer that these practices have resulted in an adverse and disparate impact on a significant number of black sheet metal journeymen solely from the facts that the two practices exist and that no blacks were admitted directly from 1965 through 1975 while 106 whites were admitted directly during that period (St. 249). In

support of its argument the plaintiff has referred the court to *United States v. Local 36, S.M.W.I.A.*, 416 F.2d 123, 132 (8th Cir. 1969), *rev'g and remanding* 280 F.Supp. 719 (E.D.Mo.1968) (*St. Louis sheet metal* case). In the *St. Louis sheet metal* case, the defendant's liability under Title VII was established on the basis, *inter alia*, of a union boycott of a construction project employing black craftsmen, of a failure to organize known black contractors, and of a replacement by the union, after suit was filed, of a nonexclusive first in, first out referral procedure with an exclusive hiring hall procedure giving first priority to those journeymen (all white) having at least one year of work experience in the union, 416 F.2d at 127–131. About the priority referral system the court wrote:

> "We recognize that each of the cases cited in n. 15 to support our position can be distinguished on the ground that in each case, a number of known members of a minority group had been discriminated against after the passage of the Civil Rights Act. Here, we do not have such evidence, but we do not believe that it is necessary. The record does show that qualified Negro tradesmen have been and continue to be residents of the area. It further shows that they were acutely aware of the Locals' policies toward minority groups. It is also clear that they knew that even if they were permitted to use the referral system and become members of the union, they would have to work for at least a year before they could move into a priority group which would assure them reasonably full employment. In the light of this knowledge, it is unreasonable to expect that any Negro tradesman working for a Negro contractor or a nonconstruction white employer would seek to use the referral systems or to join either Local."

*Id.* at 132.

In the *St. Louis sheet metal* case, Local 36's facially neutral practice of defining referral priority by work experience in the local union in the context of an *exclusive* referral system had the impact of excluding a number of known and qualified Negro tradesmen from referral Group I, of admitting no Negro tradesmen to Group I, and of admitting the then current union membership, almost entirely white, to Group I. Thus the qualified black workers could not obtain a union job until all of the qualified white workers in the union had first been given jobs. The disparate impact of that system on black workers followed automatically from the joint operation of the referral priority system and the fact that union contractors hired *exclusively* through referrals made by the local union.

In contrast, in the present case the union contractors do their own hiring and are not bound to hire exclusively from a referral list supplied by Local 122. As previously noted, the union contractors within Local 122's jurisdiction are not precluded from hiring non-union journeymen and, in fact, have frequently done so in the past. Indeed, at least on federal government construction projects, union sheet metal contractors are almost desperate to hire black journeymen sheet metal workers. In Mr. Witherspoon's case, he was hired with Local 122's "blessing" (contrast the St. Louis union's boycott), and he was recruited for Local 122 membership, but to no avail. In contrast to the apparently significant number of qualified black workers in the *St. Louis* case, here there is evidence of less than 21 qualified black journeymen, of whom 11 work for a nonunion shop which Local 122 has twice tried to organize. The significant differences in circumstances between the present case and the *St. Louis* case eliminate the latter case as authority for the proposition advanced herein by the plaintiff.

 Weighing these circumstances and all the other facts in this case, this court is unable to find by a preponderance of the evidence produced at trial that the union job requirement (considered alone or together with the contractors' hiring practice)

has had a disparate impact on black compared to white journeymen to date.[18]

Since the defendant prevailed on this claim of the plaintiff despite its tardy identification, there is no need to consider the issue of whether the defendant was prejudiced from its belated identification.

#### (4) Direct Admission and Union Security Clause

The Collective Bargaining Agreement between Local 122 and the Sheet Metal and Roofing Contractors Association, as well as Local 122's agreement with independent sheet metal contractors, requires that non-union sheet metal workers working for union employers become members of Local 122 within seven days after beginning their employment (St. 273; PX 79, Article IV, at 5). The foregoing requirement, known as "the Union Security Clause", in the past has been generally ignored by officials of Local 122 and by the sheet metal contractors (St. 274). On one occasion, however, where officials of Local 122 believed that a white journeyman employee of a union contractor would not voluntarily apply for membership in the union, that employee was required to apply for admission (St. 244). Subsequently, when the same individual obtained a zero on the required journeyman examination, the union, believing that he was "faking" his lack of knowledge, waived the test requirement and told him to join the union or leave his employment with the sheet metal contractor (St. 245). Other than this one instance, the plaintiff has presented no testimonial or documentary evidence of an enforcement of the union security clause.

Emmanuel Witherspoon, a black sheet metal worker employed as a journeyman by two union contractors during 1971–1974 (13 Tr. 26–30; 14 Tr. 39–42), was recruited for membership in Local 122 in the summer of 1974 and early 1975. Although Mr. Witherspoon expressed interest in joining Local 122, he did not submit an application at that time. He is now believed dead (14 Tr. 2–5, 52–60).

The plaintiff has not shown that the union security clause itself or Local 122's application of it results in a pattern and practice involving disparate treatment of, or having a disparate impact on, black sheet metal workers.

#### (5) Direct Admission and Special Recruiting Efforts

At times when certain types of specialized journeyman sheet metal workers were needed, Local 122 has recruited sheet metal workers away from non-union contractors for direct admission into the union as journeymen. In the 1950's sheet metal roofers were recruited but the number, if any, successfully recruited does not appear (12B Tr. 157). In 1962 apparently two layout men were recruited (Id. 158). And in the 1960's, perhaps as late as 1968, efforts were made to recruit journeymen for work at great heights, but the record is unclear whether the efforts were successful (Id. 158–161).

During the 1969–1971 period, the Baltimore Building Trades Council (comprised of the executive officers of the building trade unions) organized, and Local 122 participated in, a Model Cities Journeyman Craft Training Program to recruit and train on-the-job black sheet metal and other mechanical trade workers who were too old for the regular apprentice programs and not qualified as journeymen in other ways. Local 122 agreed in writing to accept into membership graduates of this program. After the completion of seven of a hoped for 1500 houses under the program, the program itself closed when federal funding proved inadequate. No black sheet metal workers were admitted to Local 122 through this program (12A Tr. 10–14, 19–21, 32–36; 12B Tr. 104–105).

In 1971, the Baltimore Building Trades Council and the L.E.A.P. program—a joint program with local minority groups—applied to the Labor Department for a grant

---

18. In the future, circumstances may change and such a disparate impact may develop. Defendant's counsel should advise it about the possible future consequences of the union job requirement for direct admission.

to recruit, train and place in a union forty black journeymen in trades to be selected during the grant by the Council depending on work availability. The application was denied because the Labor Department wanted a pre-grant designation of the number to be placed in each trade (12B Tr. 24–31; 32–36).

In the summer of 1974 and early 1975, Local 122 attempted to recruit Mr. Witherspoon, a black sheet metal worker employed by a union contractor, in part because Local 122 had received requests from its union contractors for black sheet metal workers to work on federal projects subject to affirmative action goals and quotas (14 Tr. 31–32, 40, 53–54). Doubtlessly the union recruiters were aware that this suit and its companion private § 1981 suit were pending. This court believes that the attempts to recruit Mr. Witherspoon would have been made regardless of these suits, because the union contractors and through them the union were under significant government pressure for the employers to hire and for the union to supply black journeymen for work on government contracts.

■ The plaintiff has not shown by a preponderance of the evidence that Local 122 treated blacks differently and less favorably than whites in its special recruiting efforts. On the contrary, Local 122 has prior to this suit, and in at least one instance after the institution of this suit, tried to increase its black membership—albeit unsuccessfully. In the context of this case and of the very small number of men admitted through special recruiting efforts, there is no persuasive basis to support an inference of disparate impact on blacks of the special recruiting efforts of Local 122.

## C. JATC GRADUATES

Local 122 participates in an apprenticeship program administered by the Sheet Metal Local 122 Joint Apprenticeship and Training Committee (JATC) which is comprised of representatives of Local 122 and the Sheet Metal and Roofing Contractors Association. Graduation from the JATC's apprenticeship program is one of the primary methods of admission to Local 122 (St. 250). After successful completion of the JATC program, an apprentice is initiated into Local 122 as a journeyman member without further testing (St. 251).

■ In this case, the court has previously found that the plaintiff did not establish a *prima facie* case of a Title VII violation by the JATC. *See* 10C Tr. 1–27.

### (1) Automatic Admission Upon Graduation

No challenge has been made by plaintiff to the automatic nature of the union admission following graduation from the JATC. There is no evidence that the practice adversely affects black or white JATC graduates. Although among the graduates, and thus union admittees from the JATC program, white persons have outnumbered black persons (St. 253–257), the plaintiff's failure to establish a *prima facie* case of a Title VII violation against the JATC *a fortiori* precludes the operation of the JATC program from being the basis for Title VII liability on the part of Local 122.

### (2) Nepotism

The plaintiff insists that Local 122 engages in patterns and practices of racial discrimination through means of nepotism. *E. g.*, 17 Tr. 14–20. Prior to 1965, consideration for admission into the apprenticeship program was based upon an applicant's position on one of three priority lists maintained by the JATC: first priority, sons of union members and contractors; second priority, nephews of union members and contractors; and last priority, all other applicants (St. 59). During the period that priority lists were used by the JATC, all members of Local 122 were white (St. 60). Since 1965, the JATC has used a variety of facially neutral selection criteria not involving kinship (St. 62–152).

Plaintiff apparently relies on three facts to support an inference of post Title VII racial discrimination through nepotism. First, in 1975 at least 29.5% (179) of the union's 610 members were still related by blood or law to another member (St. 278–

279). Second, at the Local 122 membership meeting on November 25, 1964, a motion carried that the sons and relatives of members still be given preference in admission to the JATC (St. 280). The motion, however, was not followed and was ignored by the union leadership (12B Tr. 131–132; St. 62–152). And third, in 1968, 8 of the 16 persons indentured were relatives of members of Local 122 (12B Tr. 132–137).

On the other hand, there exist unchallenged facts to negate any inference of racial discrimination through nepotism by Local 122 in the operation of the JATC. In early 1972, the JATC and the Maryland Apprenticeship and Training Council agreed to an affirmative action plan mandating that 23% of each entering apprenticeship class be black (St. 136–140). In 1972, 25% of the apprentices indentured were black (St. 58(a)). In 1973, there was no apprentice class indentured (St. 58(b)). In 1974, 37% of the apprentices indentured were black (St. 58(c)). In 1975, there was no apprentice class indentured (St. 58(d)). In 1976, 29% of the apprentices indentured were black (St. 58(e)).

■ The plaintiff has not shown by a preponderance of the evidence the existence of a current or post-Title VII practice of nepotism in the JATC's apprentice program or in any aspect of Local 122's operations.

*(3) Other*

The operation and control of the apprentice program is in fact exercised by the Joint Apprentice Training Committee, whose members exercise judgment independently of Local 122 and the contractors' association (12B Tr. 49–53, 60–61, 62, 69–73).

■ There is no evidence that the union engages in a pattern and practice of treating black apprentices or JATC graduates differently from white apprentices or JATC graduates.

*D. ORGANIZING NON–UNION SHEET METAL SHOPS*

One of the methods by which Local 122 recruits new members is through organization of non-union sheet metal shops.

During the period 1965–1974, Local 122 took in no black journeyman members from any shop organizing activities, but there is no evidence that the defendant failed to attempt to organize a non-union shop because blacks were employed there. There is no evidence that there are any all black non-union sheet metal shops.

The evidence does not disclose the total number of non-union sheet metal shops which were organized by Local 122 after the effective date of Title VII nor the total number of unsuccessful organization attempts made during the same period of time.

In some organizing attempts, the local union has approached the non-union contractor directly as described by Mr. Russell:

"Q. . . . How does a Union become interested in organizing a shop?

"A. We go to a sheet metal shop and try to explain to them the advantages of becoming a union sheet metal contractor. Now, this contractor may have been a small contractor who did residential work or just small work, which normally our contractors do very little or none of. Then, he starts branching out into the light commercial work, and he starts to grow a little larger, and wants to get into the bigger end of it in the heavy industrial and commercial work. Then, we might go to the non-union contractor and talk to him and explain the situation and the advantages of becoming union and signing our contract.

"If he wanted to sign our contract we gave him two things—that the work he already had under contract he would finish under whatever he had bid under and, secondly, that any employee that he had, we would take into our union."

12B Tr. 163.

In other organizing attempts, apparently where the contractor has opposed organization, the union organizers have approached the employee sheet metal workers directly (14 Tr. 85–86).

In 1976 and continuing to the time of trial, Local 122 was trying to organize Ingleside Mechanical Contractors, reportedly one of the five largest mechanical contractors in the United States. It is the present employer of Mr. Jackson and a total of 11 of the 21 black sheet metal workers now in the building trade (14 Tr. 74; 15 Tr. 54, Part III(b)(1), *supra*). Mr. Jackson, a black sheet metal worker and Ingleside employee, testified that he did not now want to join the union for unspecified personal reasons (15 Tr. 50).

In 1971, prior to the filing of the EEOC or the private suit, Local 122 also had tried to organize Ingleside (15 Tr. 54). There is no evidence that the number of black sheet metal workers at Ingleside has increased or decreased from 1971 to 1977, and consequently the court will infer that the number has remained roughly the same for purposes of this case.

From the fact that to the date of trial no black journeymen sheet metal workers have entered Local 122 through shop organizing efforts, the EEOC urges an inference of disparate treatment or impact. The proposed inference must be considered under all the circumstances of this case. First, the proposed inference is negated by the small number of black journeymen sheet metal workers in the building trades, only 21. The defendant union cannot recruit for journeyman membership persons who do not exist or who do not have the necessary skill. Second, the proposed inference is negated by Local 122's two efforts—one before and another after this suit was filed—to organize Ingleside Mechanical Contractors where about 11 of the 21 black journeyman sheet metal workers are employed. The court is convinced from the evidence, and so finds, that defendant Local 122 has tried in good faith to organize Ingleside's sheet metal workers.

Although a journeyman's preference for or against membership in a trade union is a factor defining his "availability" for inclusion in the relevant work force and although it might properly have been examined earlier in this opinion, the significance of the journeyman's preference is perhaps greatest in the context of the union's efforts to organize non-union shops. Therefore, discussion of this preference was deferred until this point in the opinion.

Doubtlessly many facts influence a worker's decision to join or not to join a trade union such as Local 122. On the one hand, some advantages of union membership include a higher wage scale, participation in group health and welfare benefits funds, fellowship, and the tendency of union employers to hire union members. On the other hand, some disadvantages of union membership applicable to Local 122 and the decision to join it include levels of unemployment at times higher than in the non-union sector, restrictions on working for non-union contractors, a $1,000 initiation fee, and dues payments. The combined effect of the different wage scales and employment rates for union and non-union sheet metal workers in the building trades is illustrated by the fact that at the time of trial a black non-union sheet metal worker testified to earning a $17,000 annual income from steady employment at Ingleside Mechanical Contractors (15 Tr. 46–48), an income higher than the average Local 122 member's income (*Id.* 54–55). At one time in 1976, Local 122 had approximately 65% unemployment among its members (12B Tr. 99–100).

In short, there are significant factors which could affect an individual decision about whether to join a local union such as Local 122 which have nothing to do with race.

In this case the plaintiff has not shown by a preponderance of the evidence that Local 122's practices in organizing non-union shops have a disparate impact on blacks compared to white journeymen sheet metal workers in the building trade or that blacks have been treated differently than whites in the organizing process.

## VII.

### REPUTATION

The EEOC's final proposed basis for imposing Title VII liability on defendant

**424**

Local 122 is that in the black community Local 122 has a reputation for racial discrimination, that this reputation deters black journeymen from applying to Local 122, and that Local 122 has not publicized its non-discrimination against black journeymen (Pretrial Order at 27, Papers 250, 597; 4 Tr. 74–75).

After briefly reviewing the law on this issue, the evidence will be summarized, and findings made.

## A. LAW

The controlling cases here are *International Brotherhood of Teamsters v. United States, supra,* in the Supreme Court and *Lewis v. Tobacco Workers' International Union, supra,* a recent case, in the Court of Appeals for the Fourth Circuit.

In *Teamsters,* the defendant trucking company had engaged in a pattern and practice of treating minority applicants for over-the-road driver jobs differently from white applicants. Almost no minority over-the-road drivers worked for the defendant, and individuals had recounted 40 specific instances of racial discrimination. 431 U.S. at 334–343, 97 S.Ct. 1843. In deciding the scope of the district court's remedial power in a Title VII case, the Supreme Court then held "that an incumbent employee's failure to apply for a job is not an inexorable bar to an award of retroactive seniority." *Id.* at 364, 97 S.Ct. at 1869. The Court stated that a nonapplicant could show in some

circumstances that he was a potential victim of unlawful discrimination. *Id.* at 367, 97 S.Ct. 1843. Two distinct factual prerequisites were required by the Court for relief to be given to a nonapplicant: first, that, but for his awareness of the defendant's unlawful discrimination, the deterred applicant would have applied and, second, that upon application he would have been discriminatorily rejected. *Id.* at 368 n. 52, 97 S.Ct. 1843. See *id.* at 362–371, 97 S.Ct. 1843.[19]

In this case, the plaintiff, citing *Teamsters* principally,[20] urges that Title VII liability be imposed on defendant Local 122, alternatively (1) because Local 122 has a reputation for discrimination in the black community which deters black journeymen from applying or (2) because Local 122 has failed to publicize its nondiscrimination. A third basis for liability, implied by the plaintiff's argument, is that Local 122 has violated Title VII by acting to create a reputation for discrimination in order to deter black journeymen from applying.

The first contention that the existence itself of a reputation for discrimination by Local 122 is a basis for imposing liability under Title VII was flatly rejected in *Lewis, supra,* where the Fourth Circuit reversed the district court's imposition of liability, holding:

"Nor is it permissible to base recovery on the subjective belief of class members

19. In each Title VII case cited by the *Teamsters* Court, 431 U.S. at 367, 97 S.Ct. 1843, relief was available to a plaintiff deterred from applying to the defendant because of the defendant's unlawful discrimination in violation of Title VII. See *Acha v. Beame,* 531 F.2d 648, 656 (2d Cir. 1976) (seniority relief for women police officers not hired earlier because of gender based hiring quotas and opportunity to show deterrence from entire application); *Hairston v. McLean Trucking Co.,* 520 F.2d 226, 231–233 (4th Cir. 1975) (back pay relief for black employees not promoted because of no transfer and no rehire rules and opportunity to show deterrence from application for promotion); *Bing v. Roadway Express Co.,* 485 F.2d 441, 451 (5th Cir. 1973) (seniority relief to black truck drivers not promoted from city to road driving jobs because of no transfer rule and opportunity to show deterrence from application for promotion); *United*

*States v. N. L. Industries, Inc.,* 479 F.2d 354, 369 (8th Cir. 1973) (promotion ratio relief, *inter alia,* for black potential foreman because of personnel promotion criterion's disparate effect; liability not avoided by failures to ask for promotions as no one asked for promotion).

20. The plaintiff also cited additional district court decisions where nonapplicants were permitted relief or where the absence of applicants by itself was found not to preclude liability. *Lea v. Cone Mills Corp.,* 301 F.Supp. 97, *aff'd in pertinent part* 438 F.2d 86, 87 (4th Cir. 1971); *Cypress v. Newport News General and Nonsectarian Hospital,* 375 F.2d 648, 653 (4th Cir. 1967); *United States v. Central Motor Lines, Inc.,* 338 F.Supp. 532, 558 (W.D.N.C.1971); *Dobbins v. Local 212, I.B.E.W.,* 292 F.Supp. 413, 433 (S.D.Ohio 1968).

'that their race substantially limited their initial employment to the Stemmery.' Basing recovery on that fact is an improper consideration. The question is whether or not the company did in fact discriminate, not whether or not the employee did in fact believe the company had discriminated. It is at once apparent that the consideration of these two questions is entirely different."

577 F.2d at 1143 (footnote omitted). Rejection of liability based upon reputation alone is compelled by Title VII's language which defines the term "unlawful employment practice" with respect to a local union:

"(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

"(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

"(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section."

42 U.S.C. § 2000e–2(c). A local union must itself do something to violate Title VII; it does not violate Title VII because someone else thinks it has violated Title VII. This conclusion is entirely consistent with *Teamsters* because one distinct predicate for liability announced by the *Teamsters* Court was that upon application the deterred applicant would have been discriminatorily rejected. *See* 431 U.S. at 368, n. 52, 97 S.Ct. 1843.

■ The second contention that Local 122's failure to publicize its nondiscrimination is a basis for imposing Title VII liability was also flatly rejected in *Lewis, supra,* where the Fourth Circuit held:

"We do not think a failure of the company to announce innocence is a violation of Title VII."

577 F.2d at 1143. Again, scrutiny of Title VII's definition of "unlawful employment practices" reveals no basis for such a duty. *See* 42 U.S.C. § 2000e–2. Although Title VII does require a labor union to post certain notices, 42 U.S.C. § 2000e–10; 29 C.F.R. § 1601.27 (1977), there is no evidence in this case that the notices were not posted, and, in any event, the failure to post is not itself an unlawful employment practice but only a violation whose willful commission is punishable by a $100 fine. *Id.*

■ The implied third basis for liability advanced by the EEOC is that Local 122 has violated Title VII by acting to create a reputation for discrimination in order to deter black journeymen from applying. Analysis of this proposition, however, reveals that Title VII would have been violated when an act was performed which had a racially discriminatory effect, irrespective of whether it created a reputation for Local 122. For example, the union's posting a "whites only" sign on its office door would itself be an instance of disparate treatment violating Title VII, regardless of the act's creation of a reputation. *See Teamsters*, 431 U.S. at 365, 97 S.Ct. 1843. Likewise, designing a journeyman test to establish an artificially high failure rate which would deter black journeymen from applying is unlawful. *See Dobbins*, 292 F.Supp. at 433. And also a union officer's or members' discouragement of applications by black but not white journeymen co-workers by word-of-mouth or deed could also be unlawful disparate treatment regardless of any resulting reputation. As Judge McMillan in *United States v. Central Motor Lines, Inc.,* 338 F.Supp. 532 (W.D.N.C.1971) wrote:

"[I]t is unlawful for a company to give false, misleading or incomplete information to blacks, or to fail or refuse to inform blacks of the procedures and opportunities for obtaining employment

. . . .

"In proving a pattern or practice of racial discrimination, evidence of the dis-

criminatory reputation of an employer is relevant and admissible. Such evidence is admissible to show *how and why* blacks may have been discouraged from applying for traditionally white jobs and *how and why* some of those who did apply may have been discouraged from pursuing their applications."

*Id.* at 558–559 (emphasis added) (citations omitted). Even in the hypothetical where a union decides to comply with Title VII in its actual admissions and referral practices but to spread rumors of its discrimination against blacks throughout the community, the unlawful act is spreading the rumors. The action itself is the unlawful employment practice; proof of resulting reputation is not necessary to establish liability, nor, as noted above, is it a sufficient basis for liability.

■ Although proof of reputation *per se* is neither necessary nor sufficient to establish defendant Local 122's Title VII liability, the existence *vel non* of a defendant's reputation for discrimination is a relevant fact in determining whether an individual non-applicant would have applied to the defendant but for the defendant's discrimination because it buttresses his testimony that he was aware of the discriminatory practices of the defendant. Thus, in a case otherwise warranting certification of a class under F.R.Civ.P. 23, the existence *vel non* of the reputation could be a common question of fact meeting the requirement of Rule 23(a)(2). *See Byrd v. Local 24,* 14 E.P.D. § 7761, at 5745–5747 (D.Md.1977) (class certification in related private plaintiffs' case).

With these rules in mind, the plaintiff's evidence on the reputation of Local 122 will be reviewed for testimony about any actions by Local 122 from which liability may result.

**B. LOCAL 122's REPUTATION**

The testimony concerning Local 122's reputation for discrimination varied dramatically. Among the black sheet metal workers in the building trade, some testified to Local 122's reputation for racial discrimination, and some were silent on the direct issue of reputation while their actions belied any knowledge of a discriminatory reputation. Mr. Winkie in 1963 talked with journeymen sheet metal workers and then tried to apply to Local 122 (2 Tr. 78, 81–82, 104).[21] Mr. Williams, who is now a non-union sheet metal foreman and was terminated from Local 122's JATC apprentice program was not questioned in this case about Local 122's reputation (2 Tr. 109–154). Mr. Collins, a current black apprentice, testified that he had not encountered anyone talking about discrimination by Local 122 nor anyone saying he had not applied to Local 122 because of such a reputation for racial discrimination (14 Tr. 141, 150–152). Mr. Robinson, a current black journeyman member of Local 122 who testified for plaintiff on the out-of-work list question, answered "no" to a question whether he had "any conversations with the people in the black community which gave [him] knowledge, one way or another, of Local 122's reputation?" (8 Tr. 75, 104–105).[22] Mr. D. L. Anderson, a sheet metal worker in various non-union shops, testified that most of the black sheet metal workers he knew did not "feel like going over to Local 122 because . . . [it did not] want to hire anybody black" (8 Tr. 61–62). Mr. Anderson himself inquired in 1972 at Local 122 and incorrectly believed that he was turned away on account of his race. Doubtlessly, his belief has been communicated to his friends. In any event, Mr. Anderson is not qualified as a journeyman level sheet metal worker. Mr. Jackson, a black non-union sheet metal

---

**21.** It is now too late for Mr. Winkie himself to complain about his racially discriminatory rejection which occurred prior to the effective date of Title VII. There is no evidence here of any other black journeyman's awareness of and deterrence by this event.

**22.** Defendant objected to the question a little slowly and was sustained apparently on the basis of improper form after the answer. *Cf.* F.R.Evid. 405; *10 Moore's Federal Practice* § 405 (1976 ed.). The testimony is considered for its literal statement that Mr. Robinson had no such conversations. F.R.Evid. 401–402.

journeyman at Ingleside Mechanical Contractors (a current and past union organizing target), testified that in 1974, while in his third year of the non-union contractors' apprentice program, he considered joining the union, but was discouraged from doing so as a result of rumors of favoritism and nepotism in the union spread by white co-workers who were former union members (15 Tr. 37–41).

 The foregoing testimony by black sheet metal workers in the building trade does not disclose any specific actions taken by Local 122 or its members after the effective date of Title VII to discourage black journeymen from applying to Local 122. Weighing this testimony and the other evidence, the court finds the plaintiff has not shown by a preponderance of the evidence that defendant Local 122 has a general reputation for racial discrimination among black sheet metal workers in the building trade, although plaintiff has shown specific individuals who believed Local 122 to discriminate on the basis of race. *Compare Lewis v. Tobacco Workers' International Union, supra*, where witness's inconsistent actions were more probative than testimony. 577 F.2d at 1140.

Two other black craftsmen testified that Local 122 has a reputation for racial discrimination. Mr. Campbell, a welder by trade, testified that Local 122 has a reputation for racial discrimination among his friends and co-workers in Washington and Baltimore (7 Tr. 46, 49–53). The source of the reputation of which Mr. Campbell testified was not made clear. He had never worked in a sheet metal shop nor had he himself done sheet metal work on a building in this area although he had worked on jobs where sheet metal work apparently was being done (*Id.* at 54–57). Mr. Evans, a first class sheet metal worker at Bethlehem Steel's Sparrows Point Shipyard, testified that in late 1971, when laid off, he considered applying to Local 122; that he heard from a white co-worker with no evidenced union connection that he would be wasting his time applying to Local 122 and, although no particular reason was given,

Mr. Evans "just put two and two together"; that he later heard from Mr. D. L. Anderson (the same Mr. D. L. Anderson as in part III, C, *supra*), also at one time a co-worker at the shipyard, that he would be wasting his time at Local 122; and that he never applied to Local 122 (15 Tr. 14, 19–23).

In this testimony by a black welder and shipyard sheet metal worker, there is no evidence that Local 122 or its members do anything to discourage black journeymen from applying to Local 122. Although this testimony is consistent, the court does not believe it of sufficient scope and weight to warrant a finding that Local 122 has a general reputation for discrimination among black craftsmen in this geographic area. However, relying on the testimony of Mr. D. L. Anderson and Mr. Evans, the court finds that among black sheet metal workers at the Bethlehem Steel Sparrows Point Shipyard, Local 122 has a local reputation for discrimination against blacks.

Among affirmative action program organizers and supervisors in this area, Local 122 has a "reputation for discrimination against blacks" although the "reputation" stems largely from Local 122's being a construction trade union and from its racially imbalanced membership. (4 Tr. 23, 36–44, 63–76, 79–80 (Mr. Burleigh); 9 Tr. 57–74, 66–68, 72 (Rev. V. Dobson)). In the testimony by two affirmative action program organizers, however, there is no evidence that Local 122 or its members do anything to discourage black journeymen from applying to Local 122.

## VIII.

### ULTIMATE FINDINGS OF FACT

The plaintiff EEOC has not shown by a preponderance of the evidence a single isolated instance since 1965 where the defendant Local 122 has treated a qualified black sheet metal worker differently than a qualified white sheet metal worker.

The plaintiff EEOC has not shown by a preponderance of the evidence that defendant Local 122 engages in a pattern or practice of disparate treatment of black journeymen sheet metal workers.

The defendant Local 122 uses a number of facially neutral employment practices. There is no evidence that these practices have changed materially from 1965 to date. About plaintiff's burden when relying on statistical evidence, the Fourth Circuit, *en banc*, has held:

"[T]he establishment of a *prima facie* case does not require a finding in favor of the party establishing it; but only permits that finding. *Wright v. Rockefeller*, 376 U.S. 52, 57, 84 S.Ct. 603, 11 L.Ed.2d 512 (1963). A risk of non-persuasion is yet on the plaintiff, as also has been noted in at least one learned journal cited by us with approval in *Barnett*, Note: *Employment Discrimination: Statistics and Preferences under Title VII*, 59 Va.L. Rev. 463 (1973), just as is a risk of non-persuasion on the defendant if he does not rebut the *prima facie* case. See *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215 (4th Cir. 1976). While the burden of going forward with the evidence may shift to the defendant if the plaintiff has made a prima facie case, risk of non-persuasion is yet on the plaintiff as well as the defendant, and the defendant is not prevented from having the court consider all of the evidence before it is determining whether a case has been made. *So the court, in determining whether a party has successfully overcome risk of non-persuasion, should consider all of the statistical information before it, as well as all the other evidence bearing on the presence or absence of discrimination in employment.*" (emphasis added).

*Roman v. ESB, Inc.*, 550 F.2d at 1350–1351. *Cf.* F.R.Evid. 301; 10 *Moore's Federal Practice* § 301 (1976 ed.). After weighing all the evidence in this case, the court finds that plaintiff EEOC has not shown by a preponderance of the evidence that Local 122's facially neutral employment practices have a disparate impact on black compared to white sheet metal journeymen.

The statistical data on the small number of black workers in Local 122 does raise a suspicion of discrimination. However, after considering the data on the small number of black sheet metal journeymen, the documentary evidence, and the oral testimony, this court finds on this record that the plaintiff has not shown by a preponderance of the evidence discrimination by Local 122. As the *Roman v. ESB* court wrote:

"[T]he court properly decided the case on the record before it, not its suspicions." 550 F.2d at 1351.

The evidence in this case does not substantiate the suspicions.

## CONCLUSIONS OF LAW

The Court has jurisdiction of this action under 28 U.S.C. § 1345 and § 707(b) of the Civil Rights Act of 1964, (Title VII), *as amended*, 42 U.S.C. § 2000e–6(b).

The Attorney General of the United States was authorized to institute this action on behalf of the United States under § 707(a) of Title VII, 42 U.S.C. § 2000e–6(a), to obtain relief for alleged pattern and practice of racial discrimination by the defendant, resulting in denial of the full enjoyment by black persons in the Baltimore area of the rights of equal employment opportunity secured by Title VII. On March 24, 1974, authority to enforce Title VII through pattern and practice actions was transferred to the Equal Employment Opportunity Commission (EEOC) under the provisions of Section 707(d) of Title VII, 42 U.S.C. § 2000e–6(d), and the EEOC was substituted as plaintiff in this action.

Defendant Sheet Metal Workers International Association Local No. 122 (hereinafter "Local 122") is a labor organization within the meaning of 42 U.S.C. § 2000e(d) and is engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e(e).

Liability under Title VII could be imposed on defendant Local 122 for racially discriminatory actions taken by it prior to the filing of the complaint in this action on January 3, 1974 or for such actions having a racially discriminatory effect. *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Parham v. Southwestern Bell Telephone Company*, 433 F.2d

421, 425 (8th Cir. 1970) (dramatic post-complaint changes in hiring); *Rich v. Martin-Marietta Corp.*, 522 F.2d 333, 346 (10th Cir. 1975) (apparent post-complaint improvement in practices); *Rice v. Gates Rubber Co.*, 521 F.2d 782, 784–785 (6th Cir. 1975) (post-complaint affirmative action program); *Jones v. Tri-County Electrical Corp.*, 512 F.2d 1, 2 (5th Cir. 1976) (dramatic increase in applicant flow statistics).

Liability under Title VII could as well be imposed on defendant Local 122 for its actions, if unlawful, from the date suit was filed to the date of trial. *See, e. g.*, F.R. Civ.P. 15, 16; *Griffin v. County School Board*, 377 U.S. 218, 226–227, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); *United States v. Local 36, S.M.W.I.A., supra*, where Title VII liability was based, *inter alia*, on an exclusive hiring hall practice implemented after trial pursuant to a post-suit collective bargaining agreement, 416 F.2d at 124, 130; 280 F.Supp. 720–723; 3 *Moore's Federal Practice* ¶ 15.16 (1974 ed.); 1B *id.* ¶ 0.405[3], (1974 ed.) (res judicata prevents relitigation of all grounds for recovery on same claim that were available to parties before judgment rendered on that claim).

 In determining whether Local 122 is liable under Title VII in this case, the court has a right to consider its post-complaint conduct as probative both on the allegations of post-complaint discrimination by it and on allegations of pre-complaint discrimination by it. Post-complaint non-discriminatory conduct does not, however, erase pre-complaint unlawful conduct if such there be. The weight to be ascribed to evidence of the existence or lack of it of pre-complaint discrimination varies, of course, with the circumstances and depends entirely on the extent to which there is a showing of continuity between the post-complaint conduct and the pre-complaint conduct. Its probative value may disappear altogether if defendant's conduct changes. *See, e. g.*, F.R.Evid. 401, 402, 406, 407 *Cypress v. Newport News General and Nonsectarian Hospital*, 375 F.2d 648, 657–658 (4th Cir. 1967) (post-complaint admission of 1 of 18 black physicians to hospital privileg-es); *Gamble v. Birmingham Southern R.R.*, 514 F.2d 678, 683 (5th Cir. 1975) (just before trial, four black workers promoted).

In this complaint of the plaintiff against Local 122, no result would be changed by an analysis of the facts using one time frame or another because the plaintiff EEOC failed to prove its case for the largest possible time frame, 1965 to the trial date, or any part thereof. Nonetheless, since a specific conclusion of law on this point was requested by the plaintiff, since the complaint of the EEOC in this case against the JATC in the sheet metal trade, on which this court has already ruled, might be affected in part by the use of a particular time frame, and since the shortcomings in the evidence against Local 122 are further illustrated by such a discussion, the court will discuss to the extent pertinent to this case the role of time limitations on liability and relief in a "pattern and practice" suit filed by the Attorney General under 42 U.S.C. § 2000e–6(a) and continued by the EEOC under § 2000e–6(d).

Preliminarily, it is important to recall that the Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, 86 Stat. 107, changed significantly the provisions of Title VII of the Civil Rights Act of 1964, Pub.L. No. 88–352, 78 Stat. 261, governing pattern and practice suits under § 707 of Title VII, *as amended, and codified* at 42 U.S.C. § 2000e–6. This case was initiated by the Attorney General without prior administrative conciliation efforts on January 2, 1974, under 42 U.S.C. § 2000e–6(a), less than three months prior to the expiration, pursuant to 42 U.S.C. § 2000e–6(c), of his authority to file such a suit. Effective in April 1974, the EEOC was substituted for the United States, and the proceedings continued without abatement, 42 U.S.C. § 2000e–6(d); Paper 57.

Several considerations bear on the selection and use of the time period on which the attention of the court and the parties should be focused in determining liability and relief in a § 2000e–6 pattern and practice suit.

First, since this case is a § 2000e–6(a) pattern and practice suit commenced by the Attorney General, there were no administrative proceedings, warnings, or conciliation efforts prior to the filing of this civil action. This is unlike the current EEOC pattern and practice suit under § 2000e–6(e) or § 2000e–5(f)(1). The absence in this case of such early administrative proceedings puts this case in a significantly different posture from *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977), and *EEOC v. American National Bank*, 574 F.2d 1173 (4th Cir. 1978). In those cases, a long delay between the filing of the administrative charge or the administrative determination and the EEOC's filing of the civil suit was excused because fundamental fairness and the general purpose of time bars to prosecution were served by the pre-complaint administrative proceedings. The Supreme Court explained:

"The absence of inflexible time limitations on the bringing of lawsuits will not, as the company asserts, deprive defendants in Title VII civil actions of fundamental fairness or subject them to the surprise and prejudice that can result from the prosecution of stale claims. *Unlike the litigant in a private action who may first learn of the cause against him upon service of the complaint, the Title VII defendant is alerted to the possibility of an enforcement suit within 10 days after a charge has been filed. This prompt notice serves, as Congress intended, to give him an opportunity to gather and preserve evidence in anticipation of a court action.* (emphasis added).

"Moreover, during the pendency of EEOC administrative proceedings, a potential defendant is kept informed of the progress of the action. Regulations promulgated by the EEOC require that the charged party be promptly notified when a determination of reasonable cause has been made."

29 CFR § 1601.19b(b) (1976), and when the EEOC has terminated its efforts to conciliate a dispute, §§ 1601.23, 1601.25." 432 U.S. at 372–373, 97 S.Ct. at 2458 (emphasis added) (footnote omitted). The Supreme Court recognized, however, notwithstanding these procedural safeguards, a defendant may be prejudiced by the delay.

"If such cases arise the federal courts do not lack the power to provide relief. This Court has said that when a Title VII defendant is in fact prejudiced by a private plaintiff's unexcused conduct of a particular case, the trial court may restrict or even deny backpay relief. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424–425, 95 S.Ct. 2362, 2374–2375, 45 L.Ed.2d 280. The same discretionary power 'to locate "a just result" in light of the circumstances peculiar to the case,' *ibid.*, can also be exercised when the EEOC is the plaintiff."

432 U.S. at 373, 97 S.Ct. at 2458. In current pattern and practice cases under § 2000e–5(f)(1), and implicitly those under § 2000e–6(e), the effect of the EEOC's delay should be evaluated only after the facts are fully developed. *American National Bank, supra.*

In this case under § 2000e–6(a), the plaintiff has submitted all its evidence for a period of time spanning 1963 to 1977; the court has weighed all the evidence and found certain facts to be established. In focusing on that evidence here and attempting "to locate 'a just result' in light of the circumstances peculiar to this case," 432 U.S. at 373, 97 S.Ct. at 2458, it is necessary to consider the relief requested by plaintiff, i. e. an injunction and back pay.[23]

A second primary consideration in the selection and use of a time frame is the general equity principle that an injunction will issue only to restrain present or threatened unlawful conduct. *See, e. g., United States v. W. T. Grant & Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *Eccles v. Peoples Bank of Lakewood Vil-*

23. There is no testimony or stipulation that seniority has a part in the operation of Local 122.

*lage,* 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784 (1948); *Walling v. Nashville, C. & St. L. Ry.,* 330 U.S. 158, 67 S.Ct. 644, 91 L.Ed. 816 (1946); *Swift & Co. v. United States,* 276 U.S. 311, 326, 48 S.Ct. 311, 72 L.Ed. 587 (1928). As Chief Judge Northrop summarized:

> " '[A] suit for an injunction deals primarily, not with past violations, but with threatened future ones . . . .' 'The necessary determination [regarding the propriety of an injunction] is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.' . . . 'When the parties discontinue the acts of which complaint is made, the questions become moot and injunctive relief should not then be granted.' "

*Hirsch v. Green,* 382 F.Supp. 187, 192 (D.Md.1974) (citations omitted).

Applying this general equitable principle to Title VII cases, several courts of appeal have concluded that even post-complaint reforms and changes in a Title VII defendant's practices obviate the need for injunctive relief although it is appropriate to retain jurisdiction over the defendant to insure the new practices are themselves effective and not a ruse. *See, e. g., Barnett v. W. T. Grant & Co.,* 518 F.2d 543, 550 (4th Cir. 1975); *Brown v. Gaston Co. Dyeing Machine Co.,* 457 F.2d 1377, 1383 (4th Cir. 1972), *adopting Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421, 428–429 (8th Cir. 1970); *Kober v. Westinghouse Electric Corp.,* 480 F.2d 240, 250 (3rd Cir. 1973); *Manning v. International Union,* 466 F.2d 812, 815 (6th Cir. 1972). Moreover, this general equitable principle is embodied in the very language of Title VII. Title VII authorizes a § 2000e–6 pattern and practice suit in a case where the defendant *"is engaged* in a pattern or practice of resistance to the full enjoyment of any of the rights secured" by Title VII. 42 U.S.C. § 2000e–6(a). As the statute speaks in the present tense, "is engaged", rather than the past tense, "was engaged", it is questionable whether a claim for relief in a § 2000e–6 pattern and practice suit can be stated by a mere allegation that the defendant *was* —but is no longer—engaged in a pattern and practice of discrimination.

In this case the plaintiff has not shown that Local 122 at the time of trial, at the time suit was filed, or at any time since 1965 has engaged in a pattern and practice of discrimination against blacks. At best, the plaintiff has shown that Local 122 uses facially neutral employment practices that have been proven on the facts in other cases to have a disparate impact on blacks. Such a showing is not alone sufficient to impose Title VII liability on Local 122 in this case nor to invoke the coercive equitable powers of this court in this case.[24]

A third primary consideration in the selection and use of a time frame within which to measure liability is the period of time for which back pay might be awarded to an individual victim of defendant's practices, if any, shown to be unlawful in this § 2000e–6(a) pattern and practice suit commenced by the Attorney General. The language of Title VII does not specify this period of time. *See* 42 U.S.C. § 2000e–6; *id.* § 2000e–5(g) (back pay limited to two years prior to filing administrative change

---

**24.** Given this general equitable principle and the § 2000e–6(a) requirement that in a pattern and practice suit the government allege and prove that the defendant "is engaged in a pattern or practice" of discrimination, it seems, at least in this case, no more than an academic or hypothetical question whether or not a § 2000e–6(a) pattern or practice suit is a suit by the United States in its sovereign capacity to the extent that no statute of limitations runs against the plaintiff United States or EEOC. Three courts of appeal, nonetheless, have concluded that a government suit for injunctive relief is a suit in its sovereign capacity. *EEOC v. Griffin Wheel Co.,* 511 F.2d 456, 459 (5th Cir. 1975); *EEOC v. Kimberly Clark Corp.,* 511 F.2d 1352, 1359–60 (6th Cir. 1975); *EEOC v. Occidental Life Ins. Co.,* 535 F.2d 533, 537 (9th Cir. 1976), *Aff'd on other grounds,* 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977). *But see* 432 U.S. at 373, 380–381, 97 S.Ct. 2447 (Justice Rehnquist, joined by the Chief Justice, dissenting in part, and writing without response by the Court that such an injunctive suit is not a suit by the United States as sovereign.)

with EEOC, but no change filed in this case.)

■ When Congress has created a cause of action but has not specified the period of time within which it may be asserted, federal courts usually infer that the analogous local time limitation should apply provided it is consistent with the federal statute. *E. g., Runyon v. McCrary*, 427 U.S. 160, 179–182, 96 S.Ct. 2586, 49 L.Ed.2d 415 (Civil Rights Act of 1866); *Auto Workers v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (§ 301 of the Labor Management Relations Act); *O'Sullivan v. Felix*, 233 U.S. 318, 34 S.Ct. 596, 58 L.Ed. 980 (Civil Rights Act of 1871); *Chattanooga Foundry & Pipe Works v. Atlanta*, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (Sherman Antitrust Act); *Campbell v. Haverhill*, 155 U.S. 610, 15 S.Ct. 217, 39 L.Ed. 280 (Patent Act).

"This 'implied absorption of State statutes of limitation within the interstices of . . . federal enactments is a phase of fashioning remedial details where Congress has not spoken but left matters for judicial determination.' *Holmberg v. Armbrecht*, 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 L.Ed. 743."

*Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 367, 97 S.Ct. 2447, 2455, 53 L.Ed.2d 402 (1977).

Three courts of appeal have concluded in a § 2000e–6(a) pattern and practice suit filed before the effective date of the 1972 amendments that the analogous local limitation period established the period of time for which an individual victim might be awarded back pay. *See United States v. Georgia Power Co.*, 474 F.2d 906, 922–925 (5th Cir. 1973); *United States v. Masonry Contractors Ass'n*, 497 F.2d 871, 876–877 (6th Cir. 1974); *EEOC v. Local 638, Enter-* *prise Ass'n of Steamfitters*, 542 F.2d 579, 590–591 (2nd Cir. 1976).[25]

Similarly the courts of appeal have concluded, in § 2000e–5(f) private suits filed before the effective date of the 1972 amendment adding § 2000e–5(g)'s two year limit in back pay, that the analogous local limitations period established the period of time for which victim might be awarded back pay. *See Laffey v. Northwest Airlines, Inc.*, 185 U.S.App.D.C. 322, 359–362, 567 F.2d 429, 466–469 (1976); *Watkins v. Scott Paper Co.*, 530 F.2d 1159, 1194–1197 (5th Cir. 1976); remanding 6 FEP Cases (S.D.Ala.1973); *Local 974 United Transportation Union*, 532 F.2d 336, 341 (4th Cir. 1975), approving and adopting approach to back pay computation developed in *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1379–80 (5th Cir. 1974); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 259–263 (5th Cir. 1974); and *Baxter v. Savannah Sugar Refining Corp.*, 495 F.2d 437, 443–445 (5th Cir. 1974).

Since the 1972 amendment adding § 2000e–5(g)'s two year limit on back pay relief, in all cases under § 2000e–5(f) and perhaps in EEOC initiated cases under § 2000e–6(e) (which requires that the case be conducted in accordance with the procedures of § 2000e–5) back pay relief is available only for the two year period prior to the filing of an administrative charge.

■ The court has not found a case which has decided the period of time for which an individual victim may be awarded back pay in an Attorney General's § 2000e–6(a) pattern and practice suit, like this one, commenced between the effective date of the 1972 amendment to § 2000e–5(g) and the expiration of the Attorney General's power to file such a suit. The choice is between an application by analogy of Maryland's general three year statute of limita-

---

**25.** These courts agreed that a demand for back pay relief for an individual victim even though made in a suit by the United States was subject to a time limitation since they rejected the argument that such a claim was made by the United States in its sovereign capacity. *Cf. Occidental Life Ins. Co. v. EEOC*, 432 U.S. at 380–384, 97 S.Ct. 2447, § 2000e–5(f) (Justice Rehnquist joined by the Chief Justice, dissenting in part, and writing that such is not a suit by the United States as sovereign. *But cf. EEOC v. Occidental Life Ins. Co.*, 535 F.2d at 537, *aff'd on other grounds*, 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977).

tion.[26] In this case the court indicated that it believed the three year period to be the appropriate one although a finding in favor of the defendants on the facts has made unnecessary a choice on the issue. Upon reanalysis, the court is still of the view that the preceding authorities favor use of the three year period.

Given that there is a time limit on the availability of back pay relief to individuals, in this case assumed to be January 2, 1971 (three years prior to the date suit was filed) to date, a decision that an individual or group was injured by unlawful employment practices of any of the defendants prior to that date, but not after, could be no more than an advisory opinion without effect on the relief available. *See, e. g., North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971); *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–241, 57 S.Ct. 461, 81 L.Ed. 617 (1937); *6A Moore's Federal Practice* ¶ 57.12 (1974 ed.). In an analogous situation, the Supreme Court has written:

"A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences."

*United Air Lines v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). In so far as back pay relief in this case is concerned, defendant's unlawful conduct, if any, before January 2, 1971, is relevant evidence, but by itself has no present legal consequences.

In this case, the plaintiff has not shown that Local 122 between 1971 and the trial or even between 1965 and the trial had engaged in a pattern and practice of discrimination against blacks.

Finally, after considering these factors and cases, this court concludes as a matter of law that in an Attorney General's § 2000e–6(a) pattern and practice case there are significant time limits on the availability of relief. Injunctive relief is warranted for present or threatened Title VII violations. The government must show that the defendant "*is* engaged in a pattern or practice" of discrimination. Back pay relief in this particular case would be warranted for Title VII violations injuring victims from three years prior to filing of the suit to the trial.[27]

In this pattern and practice suit the plaintiff must show that the defendant is engaged in a pattern or practice of discrimination and that discrimination against blacks is the standard operating procedure of the defendant. 42 U.S.C. § 2000e–6(a); *Teamsters, supra.*

---

26. The general Maryland three year statute of limitation (which is also applied by analogy to federal cases under the Civil Rights Acts of 1866 and 1871) is the local time limitations applicable to the local cause of action under Maryland's Declaration of Rights, Article 23, which, the court believes, is the local cause of action analogous to the § 2000e–6(a) Attorney General's pattern and practice suit under Title VII of the Civil Rights Act of 1964, *as amended. See Md.Cts. & Jud.Proc.Code Ann.* § 5–101 (1974); *Md.Ann.Code* art. 49B (1972) Repl.Vol. and 1977 Cum.Supp.) (Maryland Commission on Human Relations remedy consists of cease and desist administrative order subject to judicial review rather than original civil action); *McIver v. Russell,* 264 F.Supp. 22 (D.Md.1967) (§ 1983); *Davidson v. Koerber,* 454 F.Supp. 1256 (D.Md.1978) (§ 1983).

27. In this court's Rule 41(b) dismissal of the plaintiff government's Title VII complaint against the Joint Apprentice Training Committee (JATC) in the union sheet metal trade, it focused on the time period January 2, 1971 to January 2, 1974. 10C Tr. 21–29. (The evidence strongly supports the JATC for the period of time from 1974 to the trial.) *See, e. g.,* St. 140. At that time this court said that "the applicable statute probably is, although it has not been finally determined, the three-year statute . . . ." 10C Tr. 21. For the reasons explained elaborately here, the court adheres to the view that the plaintiff government's failure to show that the JATC engaged in a pattern and practice of discrimination from 1971 to 1974 to the trial date made an award of injunctive or back pay relief inappropriate and required judgment for defendant.

**434**

The plaintiff EEOC has not shown that the defendant Local 122 is, or has since 1965, engaged in a pattern or practice of discrimination against black sheet metal workers.

Judgment will be entered for defendant Local 122 with costs.